## BURLEY *v*. THE STATE.

Hines, J. 1. The court below charged the jury as follows: "He says, in the first instance, that he was enraged at the conduct of his wife, Rosa Lee Burley; that she had made certain statements to him with reference to her being kept by other men, and that she would not return to him; that they together with him would have to provide a support for her. He contends further outside of this outrage." The defendant excepts to this charge, on the ground that he did not make the statement and contention attributed to him by the judge therein. The judge approved this ground with the following statement: "The theory set out therein was by counsel for defendant presented to the jury in their argument." *Held:*

(*a*) It is error for the trial judge to tell the jury that the defendant, who is charged with the murder of his wife, "says, in the first instance, that he was enraged at the conduct of his wife," when it does not appear either from the evidence or his statement that he made any such statement or contention. This is so for the reason that the judge should not give to the jury an instruction not warranted by the evidence in the case or the statement of the defendant. *Rooks* v. *State,* 119 *Ga.* 431 (46 S. E. 631) ; *Shannon* v. *State,* 147 *Ga.* 172 (93 S. E. 86) ; *Taylor* v. *State,* 155 *Ga.* 785, 787 (118 S. E. 675).

(*b*) The fact that the theory set out in the above instruction was presented by counsel for the defendant in their argument to the jury did not justify the court in giving this instruction. *Horton* v. *State,* 120 *Ga.* 307 (47 S. E. 969) ; *Tanner* v. *State,* 145 *Ga.* 71 (88 S. E. 554) ; *Key* v. *State,* 21 *Ga. App.* 300 (94 S. E. 283). We would not, however, for this reason alone grant a new trial.

2. The trial judge gave the jury this instruction: "I charge you, gentlemen, that upon proof of the killing the law presumes both malice and motive." The defendant excepts to this charge, on the grounds: (*a*) that it is an incorrect statement of the law; (*b*) that motive is a substantive fact which must be proved, and is not presumed as a matter of law; and (*c*) that it is an expression of opinion by the judge that motive had been proved. *Held:*

(*a*) Where the evidence adduced by the State presents two conflicting theories of fact, one based upon evidence showing the commission of the homicide without circumstances of justification, mitigation, or alleviation, thus indicating malice, and the other upon the proved statement of the defendant that he shot the deceased because she had a knife and was coming upon him, from which an inference might be drawn by the jury which negatived the existence of malice, it became a question of fact, to be determined by the jury, as to which one of these inconsistent theories was in accord with the real truth of the occurrence; and in such a case it would be proper for the trial judge to instruct the jury, that the law presumes every homicide to be malicious, until the contrary appears from circumstances of alleviation, excuse, or justification, and that it would be incumbent on the defendant to make out such circumstances to the satisfaction of the jury, unless they appear from the evidence produced against him. *Mann* v. *State,* 124 *Ga.* 760

54

(53 S. E. 324, 4 L. R. A. (N. S.) 934) ; *Warren* v. *State,* 140 *Ga.* 227 (78 S. E. 836).

(*b*) This case presenting the two conflicting theories of fact, above mentioned, the above instruction, without qualification or explanation to the effect that the law presumes every homicide to be malicious, until the contrary appears from circumstances of alleviation, excuse, or justification, and that the burden of rebutting such presumption would not rest upon the defendant where circumstances of alleviation, excuse, or justification appeared from the evidence adduced against him by the State, was erroneous. *Surles* v. *State,* 148 *Ga.* 537 (97 S. E. 538).

3. The defendant assigns error upon the failure of the judge "to charge the law of manslaughter," on the ground that it was demanded by the evidence and the statement of the defendant. *Held,* that this is too vague and indefinite an assignment of error to raise any question for decision by this court. *Wilson* v. *State,* 156 *Ga.* 42 (118 S. E. 427).

4. The defendant complains that "the trial judge failed to charge the jury upon the law of accident, which was demanded by the evidence and the statement of the defendant, and the failure of the trial judge to charge upon the law of accident deprived this defendant of his legal right before the jury trying said case." *Held,* that a charge upon this subject was not required, either under the evidence or the statement of the defendant, and the court did not err in failing to charge upon the theory of this homicide being committed by misfortune or accident.

*Judgment reversed. All the Justices concur, Gilbert, J., specially.*

No. 4348. SEPTEMBER 20, 1924.

Murder. Before Judge Shurley. Warren superior court. April 26, 1924.

Tom Burley was indicted for the murder of his wife, Rosa Lee Burley, in Warren County, on March 13, 1924. The jury trying his case found him guilty without a recommendation, and he was sentenced to be hanged. On the trial of the case the following evidence was introduced by the State:

Willie Pearl Ivey testified: I know Tom Burley, the defendant. I knew Rosa Lee Burley. She was my sister and the wife of the defendant. She is dead. She died when he killed her. It has been three or four weeks, I guess. He killed her at our house, down at Cadley, in Warren County, with a shotgun. He shot her twice. I saw him when he shot her the first time. I did not see him when he shot her the last time. When he shot her the first time, he hit her on the hip, and she ran out on the back porch. I don't know what she done then. When she ran out on the back porch, I ran out the front door. I didn't see her when she fell. I was up there at the next house when he shot her the next time. He didn't shoot her but one time more after I got that far. I saw

her after she was dead. I didn't see how many shot-wounds she had in her. She wasn't doing nothing to Tom when he shot her the first time. That was early in the morning. She was fixing to cook breakfast. He didn't live there. He stayed there that night with her. I don't know how come him to shoot her. I didn't hear anything said between them. I saw him when he shot her the first time. He raised up the gun and pointed it at her, and when he throwed it up on her he shot her. He didn't say anything. I had been in the same room all the time, but I never heard one word said. Rosa Lee had been married to Tom Burley about two or three years, and she had been over there at our house about two weeks at the time he shot her. I don't know how come she wasn't living with Tom Burley. She came to our house pretty often, and sometimes stayed two or three days, and again she would not stay but a day. Tom slept with her that night before he shot her the next morning. I slept in the same room with them. She and Tom didn't have any dispute that night. It wasn't long after Tom got up the next morning before Rosa Lee got up. It was about a half an hour. I didn't see Tom when he dressed. I was asleep. After I got up she started to cooking in another room. I heard Rosa Lee tell Tom she was not going home. If she told Tom she had a lot of men that could keep her up without her going home and living with him, I didn't hear it. I was right there in the room, and if she had said that I would have heard it. Rosa Lee had a knife in her hand, but she was not going towards Tom, because she had it slicing meat. She was not saying a word when she was slicing the meat. It was before he shot her that I heard him trying to get her to go home with him. It wasn't long after then he shot her. She wasn't cutting meat then. She had put up the meat, and still had the knife in her hand when she run out the door, when he shot her. The knife was in the house when she ran out of the door when he shot her. When Tom shot her she had the knife in her hand, but she didn't try to cut Tom. I never heard her give Tom any reason why she wasn't going home with him. I didn't hear him say anything to her, only ask her wasn't she going. The knife fell out of her hand when Tom shot her. She was not going towards Tom with the knife; she was just standing in one place. I just heard the gun the second time. I don't know who shot it.

Ada Ivey testified: I know Tom Burley. I am his wife's sister. He killed her; he shot her with a shotgun twice. I saw him when he shot her the last time. I was out doors when he shot her the first time. When he shot her the first time she ran out on the porch and fell back out of the door. She fell backwards on the ground. She was shot then. After she went out and fell on the ground, Tom went on out behind her and shot her again. He felt of her before he shot her the last time. I saw him when he pointed the gun at her. No one else was there when the shooting took place besides me and my sister. Tom and his wife slept together in the bed that night, and I slept in the room with them. I didn't hear any quarreling. I was the first up, and made the fire. They had been married two or three years. She told us when she came home that he beat her. She had been at our house two or three weeks. Tom told her they would go home the next morning; and she said she was not going. She did not say why. He loaded the gun inside and came out and shot her the second time. She was right at the back door when she fell.

G. P. Hogan testified: I saw the deceased the afternoon of the day she was shot. When I got up there they had shrouded the woman and she was lying on the bed. I helped pull the sheet back, and this arm right up here was nearly shot in two. There was a hole larger than a dollar right here [indicating]. The shot did not go straight in. It ranged toward her head. The defendant made a statement to me freely and voluntarily about this shooting. Mr. Hinton brought him over and put him in jail. I asked him how come him to shoot her, and he said she had a knife and was coming onto him. I asked him what he did with the empty shells. He said he unloaded his gun, threw the shell in the yard, and then shot her again. He said he was standing out there looking at her and his gun went off in the yard. He said he throwed that shell away over there in the woods. I went up there and tracked him around in the field, and found the shell that corresponded with the one Mr. Stagus said he found in the yard. The defendant came up voluntarily and surrendered. He said the reason he shot her the first time was, she was coming on him with a knife; but he didn't say why he shot her the second time. He said his gun must have gone off.

The defendant introduced no evidence. He made the following

statement: "Well, I went there that morning. I was sitting down talking, and I asked my wife wasn't she ready to go home, and she told me, she says one while, 'I believe I'll go home this morning;' and I says, "You have been over here a pretty good while, and I would like for you to go home.' I was sitting down there talking in a chair, and she was standing; like that is the fireplace, she was standing over there. She had the knife in her hand and some meat, and after a while she says, 'I ain't going home,' and I says, 'Well, I would like for you to go if you would,' and she says, 'I ain't going home now,' and I says, 'What is the reason, how come you don't come home, what is the reason you ain't going home this morning?' and she says, 'Well I ain't going to tell you right now how come I ain't going,' and I went and sat in the chair there and I was sitting off from her, and she come just a cursing. She says, 'No, I ain't going over there; I am going to stay over here for my men to keep me up, you and my men; I am going to stay right here for you and my men to keep me up.' I says, 'That's a pretty way for you to treat your husband.' She says, 'I ain't going back over there.' I says, 'I reckon I better go home.' I was fixing to get up, and she had some meat in her hand and her knife, and she made a break at me with the knife, and come on me with the knife, just this way, like that chair, and made a scuffle on me and I had to sorter knock her back. I run backwards and I shot her, and she had the knife and said, 'I ain't going.' She said, 'God damn it, I am going to stay over here so I can have my time with men, and you and my men can keep me up.' That is what she told me. And she says, 'I have been having them ever since I have been over here.' She had been over there about three weeks, and I was at home working, cooking for myself. Had to do everything down to feeding the chickens and everything else, and right there by myself, and had to do everything. Nobody to do a thing. Work hard and do the cooking and cook my dinner and supper, and when night come I went home and went to bed. I didn't run about and stay out at night. I worked and was trying to make an honest living. I didn't run about after nobody, trying to make an honest living. And what I got I sure got it from my muscle, and I stole nothing from nobody. What I got I sure got it trying to work hard and to make it honest; and I am telling you the truth, and I ain't going to tell no tale on my wife, not nobody

else. I am going to tell the thing like it was, and tell the truth; and when I shot her I think one piece of meat fell out that way and that piece in her hand I reckon she must have carried it out. She walked out there and fell. I don't know how she fell. I never did look to see how she fell. Before I went down there at Norwood one Saturday, she had been down there two weeks. Then I got some money from the boss I was working with, to get me some things; and I come out there that Saturday, and she told me she wanted two or three dollars. She says, 'I want some things,' and I says, 'You left home. I don't mind giving you money if you go home.' She says, 'If you give me the money to get me some things with, I'll be home Sunday.' I give her three dollars to get her some things with, and she said she wanted some dinner, and I went in there and give her thirty-five cents worth of cheese and crackers. I got a quarter's worth of cheese and got her some crackers, and she told me she was coming home the next Sunday. I went home then after she got ready and got her things. She told me to come on and go down to Ma's with her. I says, 'I got to go home and see about everything. You all get together and go on home. Are you coming?' She says, 'Yes, I am coming.' I stayed at Norwood until I got ready to go home, and I went to bed. I didn't go down there that Sunday, and she didn't come. It rained, and I thought maybe the rain kept her from coming that Sunday. But after it rained and faired off that week, next week I never did see her after it broke off. I was sorter looking for her, and she made such a fair promise she was coming, and that is what made me look for her. I didn't go down there no more then; and that is the way she treated me. The second shot I just didn't know what I was doing. That second shot, I reckon I must have had the shell in there and working at it, and the second shot was made, I reckon I must have been working at it and it went off. That shot, I didn't know what I was doing. After the first shot I must have put it in there and it had done gone out of my knowledge, and I didn't know it was loaded, and fooling with it and it went off. And she told me, 'I am going to stay over here for you and my men to keep me up, and I gets about everything you work and make, and I don't treat you right.' That is what she said down there that morning. She says, 'I don't treat you right, but I am going to stay over here and be with my men folks. I

got three dollars and a quarter from you in Norwood, and I didn't mean to come home. I just told you that. My mens is going to keep me up, and my mens don't want me to go back over there.' As to when she first started it she says, 'I been started it all the time, and you didn't know it, because you didn't watch me. You would go to the field and go to working for the man, and while you are working I go off while you are in the field working hard, and I was off with my fellows, and then come back about sundown, sometime after sundown.' But I think still that she wasn't that sort of woman. I thought she was an honest woman like I was, and I didn't have no idea she would treat me no such way as she treated me. That is about all I want to say."

G. P. Hogan testified in rebuttal for the State: I only knew what the defendant told me as to whose gun that was he said he had at the time. It was little Jerry Felts'; he told me that he borrowed the gun from little Jerry Felts, and five shells. We found the gun and three shells lying on the bed. He shot the negro with two of them. The woman's right hand and right hip were shot.

The defendant moved for a new trial, which was refused by the court. To this judgment he excepted.

*L. D. McGregor, R. W. Ware, J. C. Davis,* and *J. P. Wilhoit,* for plaintiff in error.

*George M. Napier, attorney-general, M. L. Felts, solicitor-general,* and *T. R. Gress, assistant attorney-general,* contra.

GILBERT, J., concurs in the judgment of reversal, based on the ruling in the second headnote, but dissents from the ruling made in the first headnote. In the first headnote this court rules that the trial judge erred in stating, as a part of the charge to the jury, that the defendant "says, in the first instance, that he was enraged at the conduct of his wife," the criticism being upon the use of the word "enraged," it being contended that the accused did not make the statement and contention that he was "enraged" at the conduct of his wife, and that the statement was not authorized, either by the statement of the accused or the evidence. The judge, in approving this ground of the motion made a notation that "the theory set out therein was by counsel for defendant presented to the jury in their argument." The writer of this dissent, however, cannot concede that this ground of the motion shows reversible error, if error at all. "The object of all legal investigation is the

discovery of truth." Penal Code (1910), § 1008. The defendant, in his statement to the jury, outlined at great length and detail statements by his deceased wife to him, showing her wanton conduct with other men in open and utter disregard of the feelings of her husband. If the statement of the accused was truthful, if the wife did state to him the facts so detailed, her conduct could not be properly characterized as other than an "outrage," as stated by the court, and the husband could not have been, as a normal human being, other than "enraged." Moreover, the statement by the accused to the jury, in the respect named, could not conceivably have been intended for any other purpose than to convince the jury that the conduct of the wife was an "outrage," and that the accused was "enraged." If this was not the purpose, then there was no intelligent purpose on the part of the accused in making the statement. It could not have been useful to the accused upon any other basis, and it should not be supposed that it was merely thrown into the statement of the accused for the purpose of bewildering court and jury and so mystifying the issues as to be misleading. Furthermore, the note of the judge shows that the term used in the charge was authorized by the argument of counsel for the accused in addressing the jury. For my part I am wholly unable to draw any distinction between what the court was authorized to charge, based on argument of counsel addressing the court, from what the court would be authorized to charge, based on counsel addressing the jury. It would seem, and has always been the theory of this writer, that it requires judge and jury and also counsel for both sides who are officers of the court, to complete the entire court machinery for the trial of a contested criminal case. The accused is bound by the sayings of his counsel. I can see no distinction as to the conclusion legally to be drawn by the judge, depending upon whether the counsel is actually facing the judge or facing the jury, or both or neither. All that counsel may say in argument is under the supervision of the court, and must be addressed as well to the judge as the jury, notwithstanding the fact that it is within the province of the jury to determine the facts. It seems to me that it is drawing the distinction entirely too fine to say that the court is authorized to base a charge on what counsel said "addressing" the judge, but that such a charge cannot be based on argument of counsel when his side or his back is turned to the

judge and he is pressing an argument on the facts especially to the jury.

The case of *Horton* v. *State,* 120 *Ga.* 307 (supra), is cited for the ruling made by the majority. That case was by a divided court, and is not controlling. *Tanner* v. *State,* 145 *Ga.* 71 (supra), is also cited. In that case it was held that the evidence required a charge on voluntary manslaughter. The refusal to charge the law of voluntary manslaughter was made a ground of the motion for a new trial. To this ground of the motion the court appended the following certificate: "During the trial of this defendant the court called counsel representing him to the stand, and asked them to inform the court whether or not they considered manslaughter in this case, and whether they desired the court to charge on this grade of homicide," one of the counsel for the accused having argued that the defendant was absolutely justified, and the other counsel for the accused having stated to the jury that the court might charge on manslaughter, but took the position that the homicide was justifiable. In the conference with the court defendant's counsel insisted that the homicide was justifiable, "and that they did not ask, and refused to request the court to charge manslaughter. While the court was of the opinion that this grade of homicide was not included, and so told defendant's counsel, still it offered to charge the same if defendant's counsel would consent or request it. This was refused." Because of the facts here stated the court did not charge on the subject of voluntary manslaughter. This court, in construing the note of the trial judge, said: "We do not understand from the court's certificate that there was any statement or request by counsel to refrain from charging the law of voluntary manslaughter. When court inquired of counsel, in view of their argument before the jury, whether the jury should be instructed on the law of voluntary manslaughter, they replied that they did not ask for such instruction. This was tantamount to saying that they insisted upon the legal right of their client, and it was for the court to determine the propriety of making such an instruction. If defendant's counsel had assured the court that a charge upon the subject of voluntary manslaughter was neither applicable nor desired, it would not be ground for reversing the judgment, although under some of the evidence that phase of homicide was presented." The judgment in this case was con-

curred in by all the Justices, and the ruling is binding now upon this court. Properly construed, the ruling is simply to the effect that where there is evidence requiring a charge on the subject of voluntary manslaughter and the court inquires of counsel for the accused if such a charge is desired or requested, and counsel refuse to request one way or the other, the court must charge the jury on all the theories presented under the evidence in the case. The suggestion of the Justice of this court who wrote the opinion, that the utterances by counsel for the accused in the consultation with the trial judge were tantamount to saying that they insisted upon the legal right of their client, and that it was for the court to determine upon the propriety of making such an instruction, is not a direct ruling that this is the proper course to be pursued. -

For my part I am of the opinion that attorneys in criminal, as well as civil cases, whether representing the State or the defendant in a criminal case, or either party in a civil case, being officers of the court, owe a duty to aid the court in ascertaining the truth, and accordingly they are bound to exercise the utmost frankness and fairness in indicating their contentions to the court, so that the same may be fairly presented, based on a knowledge directly obtained from the parties or their attorneys of the precise contentions respectively made in the case. To do otherwise, to remain silent when the court desires, as it must in all cases, to ascertain and to know accurately the contentions of parties, is in many instances to lay a trap. It is to take a chance of obtaining a favorable verdict and, failing to do so, to obtain the benefit of an intentional plan, even if a plan of silence, to show reversible error on the part of the court which would not have occurred had there been a full disclosure of the contentions of the parties. Thus a resubmission of the case may be required which might have been avoided by a full disclosure duly and frankly made. This is not my conception of the proper administration of justice. It is rather a miscarriage of justice. The administration of justice is not a game of shrewd or mystifying deceptions or camouflaged maneuvers. The canons of ethics of the American Bar Association, which have been adopted by the Georgia Bar Association, embrace the matured judgment of the great body of highly honorable American lawyers. In part these canons contain the following statement: "The conduct of the lawyer before the court and with other lawyers should

be characterized by candor and fairness." And as further indicating the principles of candor the canons of ethics further provide: "A lawyer should not offer evidence which he knows the court should reject, in order to get the same before the jury by argument for its admissibility, nor should he address to the judge arguments upon any point not properly calling for determination by him. Neither should he introduce into an argument, addressed to the court, remarks or statements intended to influence the jury or bystanders. These and all kindred practices are unprofessional and unworthy of an officer of the law charged, as is the lawyer, with the duty of aiding in the administration of justice." Report of Georgia Bar Association 1916, pp. 413; 414. In the form of oath approved by the American Bar Association, and also the Georgia Bar Association, is included the following: "I will employ for the purpose of maintaining the causes confided to me such means only as are consistent with truth and honor, and will never seek to mislead the judge or jury by any artifice or false statement of fact or law." This is the high ground deliberately chosen by the American lawyer, and is to his everlasting credit. It looks to the public good and to the discovery of truth—"the object of all legal investigation." No criticism is intended of the attorneys in this case. None is due them. What is here said on the subject of candor with the court is deemed proper because, in the opinion of the writer, the ruling made by the court is very likely to unintentionally lead to a course of action in the practice of our noble profession which, unless protested, will result in a conception far inferior to that contained in the canons of ethics adopted for the guidance of American lawyers.