POWERS *v.* THE STATE.

2

4

No. 7897.   JANUARY 24, 1931.   REHEARING DENIED FEBRUARY 23, 1931.

*E. W. Maynard,* for plaintiff in error.

*George M. Napier, attorney-general, Charles H. Garrett, solicitor-general,* and *T. R. Gress, assistant attorney-general,* contra.

BECK, P. J.   Mrs. Sarah Powers was charged with being an accessory before the fact of murder.   She was jointly indicted with Earl Manchester, who was charged, as principal in the first degree, with the murder of James Parks.   The indictment alleged that Mrs. Powers, while absent at the time of the killing, did then and there counsel, command, and procure Earl Manchester to kill and murder James Parks on May 27, 1929.   On the trial the jury returned a verdict of guilty, without a recommendation.   The defendant made a motion for a new trial, which was overruled, and she excepted.

█   The defendant filed and urged a demurrer to the indictment. The indictment, after charging Manchester with the crime of murder in the usual terms of such an indictment, alleged that "the said Sarah Elizabeth Powers, being absent at the time of the commission of the crime aforesaid, in manner and form aforesaid, by the said Earl Manchester, did yet then and there unlawfully, feloniously, willfully, and of her malice aforethought, procure, counsel, and command the said Earl Manchester to commit the crime of murder as aforesaid.   And the jurors aforesaid, upon their oaths aforesaid, do say that the said Earl Manchester as principal in the first degree, and the said Sarah Elizabeth Powers as accessory before the fact, did unlawfully, feloniously, willfully, and with

malice aforethought kill and murder the said James W. Parks."
In the first ground of demurrer it is contended that the indictment
is defective in that it fails to allege that the defendant at the time
the alleged crime was committed was a person of sound memory
and discretion; and in the second ground, that "the indictment is
duplicitous, for the reason that it charges against the defendant two
different and distinct crimes. Said indictment charges this de-
fendant with being accessory before the fact to murder, in that
she was absent at the time that the said Earl Manchester com-
mitted the offense of murder, but that she did procure, counsel,
and command the said Manchester to commit said crime; and said
indictment also in the same count charges this defendant with
murder in the second degree, in that she was present at the time
the said Earl Manchester committed said crime, and that while
present she did procure, counsel, and command him to so commit
the crime of murder. The two different offenses charged in said
indictment are inconsistent with each other, for the reason that
the defendant could not be absent and present at the time the crime
was committed." The demurrant also insisted: "If this is a case
where the State is required to elect, then this defendant demands
that the State elect as to which offense she will be put on trial."
Also, that the indictment is defective, "because it does not allege the
place where this defendant did procure, counsel, and command the
said Earl Manchester to commit the crime." Further, that the
indictment is defective if it be construed as charging only one
offense against the defendant, that is, of being accessory before
the fact, because "it does not allege when the defendant did pro-
cure, counsel, and command the said Earl Manchester to commit
said crime of murder, and does not allege where she did procure,
counsel, and command the said Earl Manchester to commit the said
crime of murder."

The indictment is not defective for any of the reasons alleged.
It is not necessary that the indictment should allege that the de-
fendant was a person of sound memory and discretion. Under
the law, the defendant is presumed to be of sound memory and
discretion at the time of the commission of the crime until the
contrary is shown by evidence, and the burden is upon the defend-
ant in such a case to prove that he or she was not mentally capable
of committing the crime. Nor is the indictment duplicitous. It

alleges in distinct terms that the defendant was absent at the time of the commission of the crime, but that she did procure, counsel, and command the joint defendant to commit the homicide. In view of the distinct allegation that the defendant was absent at the time of the commission of the crime, the formal expression "did then and there" could not be construed as contradicting the allegation of absence and as meaning that the defendant was present when the crime was committed. Nor was it necessary that it should be alleged in the indictment when the alleged accessory procured, counseled, and commanded the actual perpetrator of the crime to commit the crime, or to show where she was when she counseled and commanded the commission of the crime.

■ The defendant filed a plea in abatement, in which it was alleged, among other things, that "R. E. Findley, whose name appears upon said indictment as being one of the grand jurors who participated in the finding and the returning of said indictment, was not drawn, selected, chosen, and sworn as a juror for the County of Bibb, but that the minutes of the court show that R. L. Findley was drawn, selected, chosen, and sworn for the County of Bibb as a grand juror for the April term of Bibb superior court, and that he did not participate in finding and the returning of said indictment." There is no merit in this plea. The fact that the middle initial in the two names is different does not show that R. E. Findley and R. L. Findley were two distinct persons, in the absence of any evidence that there was an R. E. Findley and an R. L. Findley in the county. In only exceptional cases does the law treat the middle name as a matter to be taken seriously. And besides this, the evidence showed that there was an R. E. Findlay (the last syllable being spelled with an a), but the clerk of the superior court testified that he did not know of any R. L. Findlay. The clerk also testified that "Mr. Findlay is a qualified juror; he was on the grand-jury list put in by the commissioners." Whether the name is spelled Findley or Findlay makes no difference. It is a case of idem sonans.

■ The rulings stated in headnotes 3 to 29, inclusive, require no elaboration.

■ Grounds 9, 10, and 11 of the motion for a new trial may be considered together. They contain exceptions to portions of the charge which are therein quoted. In ground 9 the instruction

excepted to is as follows: "It is contended by the State in this case that there were certain statements made by this defendant to witnesses in this case, in the nature of confessions. Now the rule as to confessions, if you should find any confessions were made, is that to make a confession admissible it must have been made voluntarily without being induced by another by the slightest hope of benefit or remotest fear of injury, and must be voluntary, and all admissions should be scanned with care, and confessions of guilt should be received with great caution." In ground 10 exception is taken to the following charge: "A confession alone, uncorroborated by other evidence, will not justify a conviction; in other words, you must be sure a confession was made. Confessions should be received with great caution." The charge excepted to in ground 11 is as follows: "If you should decide from the evidence that there was a confession made by this defendant, then you will consider that, along with other evidence in the case. A confession alone, uncorroborated by other evidence, will not justify a conviction." There are numerous exceptions to each of these charges, but all of them are challenged on the ground that the evidence did not authorize the court to charge upon the subject of confessions. And we are of the opinion that this exception is well taken. Unless a confession was shown by the testimony of Stephens or Hicks, then there was no testimony to show that the defendant made a confession. The statements made by Mrs. Powers to L. J. Stephens, which are relied upon to show a confession, are as follows: Testifying of a visit to Mrs. Powers' house, and later of a visit to her in her cell at the jail where she was confined, Stephens said: "Mrs. Powers did not give us any information as to who Parks' friends were in town. She said she didn't know anything about him, that he had a lot of women friends, that he was a regular lady's man; and she said she didn't know anything of them at all, that they were always calling him and he was always calling them. She said she didn't know any of them. Mrs. Powers said Manchester was rooming there with her. Manchester and Parks were not rooming together; they had separate rooms. Mrs. Powers showed me Parks' room and Manchester's room; they were adjoining rooms with a door opening between them. After Mrs. Powers was arrested I did not talk to her any more until between 2 and 3 o'clock the next morning,

Wednesday, May 30th. I saw her at that time upstairs in the jail. Mr. Harris and Mr. Brannan were with me. We went in the cell, and I asked her; she was lying there awake, and I says, 'You don't seem to be sleeping very much,' and she says, 'How in the name of God can I sleep?' and I says, 'What is the matter?' and she says, 'These darn chinches are about to eat me up,' and I helped her get some of the chinches off the bed, and I asked her if she wanted to talk to us about this case. I says, 'Nobody can offer you anything to all to talk, you need not talk if you don't want to, but I would be glad to hear a statement about it if you want to make it, and she asked me did I reckon she would go to the electric chair, and I says, 'I can not say.' I then asked her if she wanted to answer some questions, and she said she would, and I asked her if she wanted to tell about the boy being killed, and how it happened, and she says, 'I can not say how he was killed; all that I can say is that Mr. Manchester told me he did it;' and I asked her then how much Manchester was to get for killing him, and she said, 'A thousand dollars,' and I then says, 'About this northern woman you have been knowing so much about; there was nothing to that, was there?' and she says, 'No,' and I says, 'You planned that yourself to get these boys together?' and she said she did. Q. Did she say where the money was to come from to pay Manchester? A. She said she had an insurance policy with the Equitable Life. Q. Did she say how much she was to get herself? A. She said $7,000."

J. R. Hicks, the sheriff of Bibb County, testified to statements made to him by the defendant after she was arrested: "And she said she told Manchester about it [the insurance], and Manchester said he was broke and he would knock him off for a thousand dollars. Mrs. Powers said Manchester went out with Parks about 9:30, and Manchester returned about 11:30 or 11:35 o'clock, and says, 'I got him,' and handed her the pistol, and she put it away, and said Manchester said he took him down to the river and shot him, that they went there proposing to hold up a whisky car, and he shot him in the back of the head while Parks was lying on the ground, and he threw the cartridges in the river and brought the pistol to her. After I found the pistol Mrs. Powers said it was her pistol." And besides this testimony of Hicks relating to the alleged confession, he testified more fully in regard to that sub-

ject as follows: "I saw Mrs. Powers that night first at the city hall, and asked her several questions and did not get any information about the killing; she said she didn't know anything about the killing or who killed Parks. I brought Mrs. Powers from the city hall to the county jail that night about 9 o'clock, and I talked to her about the case and asked her about these boys that were there and what Manchester was doing there and how came him there, and she said she put an advertisement in the paper for a chauffeur for some old lady who lived on route 3, and she went to Boston, and this boy applied for the position, and she gave him a room to take care of him until this lady returned, and she said the boy Parks was there, and she had an insurance policy on him. I think she said about $3,000, I am not sure; but she said she told Manchester about it, and Manchester said he was broke and he would knock him off for a thousand dollars. She did not say whether or not she promised Manchester a thousand dollars if he did that night. We found the pistol the next day up in Mrs. Powers' residence, and Mrs. Powers said it was her pistol. Mrs. Powers said Manchester went out with Parks about 9:30, and Manchester returned about 11:30 or 11:35, and says, 'I got him,' and handed her the pistol, and she put it away, and said Manchester said he took him down to the river and shot him, that they went there proposing to hold up a whisky car, and he shot him in the back of the head while Parks was lying on the ground, and he threw the cartridges in the river and brought the pistol to her. I don't think Mrs. Powers said anything to me about Manchester wiping off the finger-prints on the pistol. Manchester told me he wiped off the finger-prints on the pistol. Mrs. Powers did not tell me where I would find the pistol. After I found the pistol Mrs. Powers said it was her pistol. Messrs. Stephens and Harris, deputy sheriffs, found the pistol in Mrs. Powers' room. I did not find the pistol. Mrs. Powers finally told me there was no such party as the lady living in the country and going to Boston that she told me about. She did not say why she published an advertisement of that sort. I don't know that Mrs. Powers told me she agreed to give Manchester a thousand dollars if he would kill Parks."

We are of the opinion that while the statements made by the defendant to the witnesses Stephens and Hicks were incriminatory

admissions, they did not amount to confessions. As to what constitutes a confession, decisions of this court may be referred to. In *Owens* v. *State*, 120 *Ga.* 298 (48 S. E. 21), it was said: "'A confession, in criminal law, is a voluntary statement made by a person charged with the commission of a crime or misdemeanor, communicated to another person, wherein he acknowledges himself to be guilty of the offense charged, and discloses the circumstances of the act and the share and participation he had in it.' Black's Law Dict. This definition of a confession was adopted and approved by the Court of Appeals of Kentucky in Spicer *v.* Commonwealth, 51 S. W. 802. 'A confession is a person's admission or declaration of his agency or participation in a crime, and is restricted to admissions of guilt.' 3 Am. & Eng. Enc. Law, 439. These definitions of a confession imply an admission of every essential element necessary to establish the crime wherewith the defendant is charged. Unless the statement of the defendant is broad enough to comprehend every essential element necessary to make out the case against him, it can not be said to be an admission of guilt. There is a difference between an incriminating statement and a confession of guilt. In the former only one or more facts entering into the criminal act is admitted, while in the latter the entire criminal act is confessed. There are a number of cases in our own reports which clearly draw this distinction. Thus, it is said by Chief Justice Bleckley in *Fletcher's* case: 'There is a very wide distinction between admitting the main fact and admitting some minor or subordinate fact or series of facts which could be true whether the main fact existed or not.' *Fletcher* v. *State*, 90 *Ga.* 468 [17 S. E. 100]. To the same effect is *Dumas* v. *State*, 63 *Ga.* 600, and *Covington* v. *State*, 79 *Ga.* 687 [7 S. E. 153]. 'A confession is rather a fact to be proved by evidence than evidence to prove a fact. It is not so much proof that a particular thing took place as it is a waiver by the party charged of his right to have certain facts alleged against him technically proven.' Wharton on Crim. Ev. (9th ed.) § 623. This conclusion of Mr. Wharton is in line with the decisions of our own court. The distinction in all of our cases is clearly drawn between the effect of admissions of fact from which the guilt of the accused may be inferred and the admission of guilt itself. Incriminating statements, to be the equivalent of a confession of guilt, must be so comprehensive as

to include every act necessary to be proved by the prosecution in order to establish the defendant's guilt. An admission of the main fact, from which the essential elements of the criminal act may be inferred, amounts to an admission of the crime itself. If the main fact is admitted with a qualifying exclusion of a necessary ingredient of the crime charged, the crime is not confessed."

In view of what this court in the cases referred to has said as to what constitutes a confession, we do not think that the evidence of the witness Stephens shows that the statements made by the defendant to him amounted to a confession. And, without restating what was said by the witness Hicks, we have reached a similar conclusion, to wit, that his evidence did not show that a confession had been made. Hicks' testimony in substance, so far as relates to the alleged confession, may be thus condensed: 1. The defendant put an advertisement in the paper for a chauffeur for an old lady, etc. 2. Manchester applied for the position and she gave him a room. 3. The boy Parks was there, and she had an insurance policy on his life for about $3,000, she said. 4. She told Manchester, the principal defendant, about it, and Manchester said he was broke and would knock him off for a thousand dollars. 5. "She did not say whether or not she promised Manchester a thousand dollars if he did that night." 6. Defendant said Manchester went out with Parks about 9:30 and Manchester returned about 11:30 and said, "I got him" and handed her the pistol, and she put it away. 7. And Manchester said he took Parks down to the river and shot him; that they went down there proposing to hold up a whisky car. These propositions contain the substance of what is claimed to be a confession by the defendant. Each is a statement of a circumstance, which circumstances may be woven together and deduction of guilt made therefrom by the jury, on which a verdict of guilty might be predicated, if the testimony be corroborated by other circumstances in the case. But what was said by the defendant to Stephens and Hicks did not amount to a confession and did not authorize a charge upon that subject by the court. And if what was testified to by Stephens and Hicks did not authorize a charge upon the subject of confession, it follows that the testimony of Conway, who had also talked to the defendant, would not authorize a charge upon that subject. And in view of this ruling it is not necessary to deal with certain other excep-

14

tions in the motion for a new trial, relating to the court's charge upon the subject of confessions.

The rulings made in headnotes 31 to 34, inclusive, require no elaboration.

*Judgment reversed. All the Justices concur.*