## 23497. WELCH *v.* THE STATE.

DECIDED JULY 24, 1934.

*James W. Smith, R. S. Foy,* for plaintiff in error.

MacINTYRE, J. The indictment in this case charges that on October 11, 1932, in Colquitt county, Georgia, E. C. James, alias Jimmy James, and Mote Welch robbed the Norman Banking Company, and that Dewey Welch was an accessory before the fact to the robbery. James pleaded guilty, and Mote Welch was tried and convicted. Dewey Welch was tried and convicted and given a penitentiary sentence. The question to be determined is whether or not the court erred in overruling Dewey Welch's motion for a new trial.

Arnold Horne, sworn for the State, testified that at "about eleven-twenty or eleven-thirty" on October 11, 1932, a time when witness was cashier of said bank and custodian of the money therein, Mote Welch and Jimmy James, dressed in Khaki overalls, entered the office of the Norman Banking Company, at Norman Park, Georgia, and held him up at the point of a pistol and robbed the bank of $926; and that on Friday before the robbery was committed on Tuesday, "these people came to the bank and got some change."

Jimmy James, sworn for the State, testified, in substance, that Dewey Welch planned and procured said robbery; that the original plan was that the witness and Mote Welch, Dewey's brother, were to rob the bank, but that Mote "got cold feet;" that Dewey Welch introduced witness to a mysterious "boy from Chicago," and they actually committed the robbery; that during the three years witness was in the liquor business he was "associated with Dewey Welch a part of the time in business," and that he "stopped at Dewey's home a part of the time;" that during the past three years he had been associated with Dewey very closely both in a business

and a social way; that two weeks prior to the robbery witness went to Cordele "on the advice of Dewey Welch" and stole "a 1931 Chevrolet sedan, practically new," to be used in the robbery; that witness left this car in an outhouse at Mote Welch's home for a few days; that Dewey first went to Norman Park with witness and looked over the town, and that Dewey got out of the car, saying that he was going to get some change; that when Dewey returned he said "it would be an easy job and ought to be good for $10,000;" that when witness and his companion left Mote Welch's house to commit the robbery, Dewey thought that about eleven-twenty or eleven-thirty would be as good a time as any to rob the bank; that Dewey was to meet them at a certain place "about twenty odd miles" from the place where the bank was robbed, not far from Bridgeboro on the Albany-Doerun Road, and about three or four miles from J. A. Pickron's home; that the robbery was committed at about eleven-thirty-one; that after the robbery witness and his companion went to said meeting place in the stolen Chevrolet sedan, pulled off their overalls and laid them down beside the car, gave Dewey Welch a little over $300 and left a little more than that in the woods, left some shotgun shells in the Chevrolet car, got in witness's "'28 coupe, model A Ford, with rumble seat behind," the car in which Dewey drove to the meeting place, and, with Dewey driving, went up by J. A. Pickron's store; that the three of them must have passed Pickron's place at about "eight minutes to twelve . . eight minutes to eleven Albany time;" that Dewey had brought some bird dogs with him, and that there were "two bird dogs right on the back seat" when they passed Pickron's store; and that certain shells exhibited to witness were the shells he had left in the stolen car that was left at the meeting place.

J. A. Pickron, sworn for the State, testified, in substance, that he had no timepiece, but that at what he thought was eleven o'clock, on October 11, 1932, he saw Dewey Welch alone pass his house going towards Moultrie from Albany on the Albany-Doerun road, traveling in a two-passenger Ford car with a rumble seat behind; that witness was sitting on the side porch of his house "here in Worth county;" that about twenty or twenty-five minutes later witness saw Dewey Welch coming back by his house on the same road "from Moultrie and Doerun going towards Albany;" that there were two men with him, and that witness's best opinion was that

Jimmy James was in the car with Dewey Welch and the other man; that witness saw a yellow and white-spotted setter dog standing up in the rumble seat of the car; that witness mentioned seeing Dewey Welch in the car to one Denison "the time he came down there looking for the green Chevrolet car and found it;" and that when the car passed witness's house "one of the men was looking out of the back window and down the road back of the car in the direction from which Aaron Vick and Mr. Horne approached in about twenty minutes."

J. N. Sumner, sworn for the State, testified in part: "I saw the tracks of a car that came out of the place where we found the abandoned car. Later I went to Albany to see the car that Dewey Welch was driving, and found this car with the same tread tires on it—Jimmy James's car, a green, model A Ford coupé with the same tread, and moved in this by-road and came out and turned towards Albany. I found the abandoned car and also where another car had been in the woods and came out and gone towards Albany. We went to Albany and found this car and drove it out . . on to a dirt street. . . It was a Firestone . . balloon tire. I compared all of the tires, and it was equipped with the same kind all the way round. I saw the car referred to as the abandoned car in the road about two miles north of Bridgeboro and off by-road that went down the edge of the woods. . . It was a green Chevrolet sedan, said to be '29 model. That is where I saw the track of the car that came up and turned. I saw two pairs of overalls lying on the ground near the left-hand side of the green car . . and the gun-shells were in the car."

Mr. Arnold Horne, recalled by the State, testified as follows: "On this day that the Bank of Norman Park was robbed by Mote Welch and Jimmy James, they came in a green Chevrolet sedan. I don't know anything about what the model the car was. I saw that sedan in Sylvester a night or two afterwards in the hands of sheriff Sumner."

J. A. Pickron, recalled for the defendant, testified in substance that while he was not altogether positive that Jimmy James was in the car that passed Pickron's house, to the best of his knowledge and belief James was in the car.

The gist of the defendant's long statement to the jury was that he was elsewhere when the robbery was committed and had no part

in it. A part of his statement is as follows: "I am not the kind of man they have tried to show. . . The worst thing I ever did, I have sold liquor and have had a few fist fights, but I never hit a white man hard enough to hurt him, and never shot a man. . . As far as the bank robbery is concerned, I had nothing to do with it. James has stayed at my house off and on at times when he did not have anywhere to stay, and I would let him have a room there to sleep. I had a big house and he slept there when he wanted to. I met him when he was working at the Herald office, and we rode around together quite a bit; and he wanted to buy a garage from me. . . I sold him the garage. After he bought the garage Mr. Stewart came to see me about some whisky—came to arrest me. I . . showed him I had nothing to do with the shop. He said that was all right,— 'I am glad you had nothing to do with it.' . . After they sent James to jail for three months, I think he served his sentence and came out to the filling station and worked for me some time, off and on. . . I was broke, but I furnished him some money to buy him some clothes, and give him another job, and he worked pretty well. . . About that time the government made a case against me about some whisky up over my filling-station, and they had me charged more with conspiracy than anything else, and Judge Deavers gave me a year and a day in Atlanta. . . The following Thursday there were some two or three different people told me: 'The law is going to claim you had something to do with that bank.' I says: 'No, they can't; I had nothing to do with it.' I thought they were joking. They said: 'Yes, there is a big reward offered for them, and this old man Pickron is going to testify you came down that road that day.' I says: 'I ain't been down the road. What time did old man Pickron say I was down there?' He says, 'eleven-thirty.' I remember where I was at and I seen what I did . . " The defendant then undertook to account for his whereabouts on the day of the robbery, the effect of his statement being that he was in and about Albany.

Aaron Denison, sworn for the defendant, testified in substance that it was about eleven miles from Pickron's store to Albany; that Dewey Welch was at witness' filling-station in East Albany at "between eleven-thirty and twelve o'clock;" and that this filling-station was on the "Sylvester road, beyond the city limits."

The defendant introduced several other witnesses whose testimony tended to show that he was elsewhere when he was said to have passed Pickron's place. M. Burnett, sworn for the defendant, testified in substance that he saw Dewey Welch at "about one o'clock, Albany time," in Albany; that he was in a Ford coupé; that Jimmy James owned a Ford roadster, and that they used first one and the other car; and that "these Ford coupés and roadsters will make sixty miles an hour easily."

The jury evidently believed the witness Horne, and there can be no question that there was ample evidence to warrant them in concluding that Jimmy James and Mote Welch robbed the bank. In so far as this feature of the case is concerned, the controlling question is whether or not the testimony of the accomplice, Jimmy James, implicating Dewey Welch as an accessory before the fact, is sufficiently corroborated. To sustain his contention that James's testimony as to the "procuring" was not corroborated, counsel cite the recent case of *Kearce* v. *State*, 178 *Ga.* 220 (172 S. E. 643). In the fourth division of the opinion in that case the Supreme Court applies the rule that the "procuring" must be proved, and that where there is no evidence aside from that of an accomplice to show the "procuring," it is not enough that other features of the accomplice's testimony be corroborated. In the *Kearce* case the Supreme Court applied the following time-honored rule laid down in *Childers* v. *State*, 52 *Ga.* 106: "In a case of a felony, where the only witness implicating the prisoners in the crime was himself avowedly guilty, the corroborating circumstances necessary to dispense with another witness must be such as go to connect the prisoner with the offense, and that it is not sufficient that the witness is corroborated as to the time, place and circumstances of the transaction, if there be nothing to show any connection of the prisoners therewith, except the statement of the accomplice." At the end of the majority opinion in the *Childers* case the court said: "The rule is, and ought to be, that some facts must be shown by other witnesses, tending to show guilt in the person on trial." In *Callaway* v. *State*, 151 *Ga.* 342, 345 (106 S. E. 577), the court said: "The language employed by Judge McKay in the *Childers* case in stating the rule is sometimes varied, but the language of that case is the best statement of the rule." In the charge, which was unqualifiedly approved, in the *Callaway* case the trial judge

instructed the jury that "the corroborating circumstances referred to must be such as to connect the defendant with the perpetration of the crime and tend to show his participation therein." It will be observed that in that case (page 345) the court holds in effect that when the corroborating evidence is circumstantial in its nature, it is not required that it be sufficient to exclude every other reasonable hypothesis than that of the defendant's guilt. "Slight evidence that the crime was committed by the defendant will corroborate the testimony of an accomplice and warrant a conviction." *Brown* v. *State,* 18 *Ga. App.* 288 (89 S. E. 342), citing *Roberts* v. *State,* 55 *Ga.* 220 (3). "The question as to whether or not there is sufficient corroboration of the testimony of an accomplice to produce conviction of a defendant's guilt is peculiarly one for the jury." *Chapman* v. *State,* 109 *Ga.* 157, 165 (34 S. E. 369). See also *Hargrove* v. *State,* 125 *Ga.* 270, 274 (54 S. E. 164), et seq.

. In the light of the foregoing authorities, do the facts and circumstances of the case at bar sufficiently corroborate the testimony of the accomplice James to sustain the defendant's conviction as an accessory before the fact? The defendant himself corroborates James's testimony that he and the defendant were very intimate friends both socially and in a business way, and that their business was not of a commendable nature. Jimmy James swore that he went to Cordele on the advice of Dewey Welch to steal a car to be used in the robbery; that James did go to Cordele and steal the car; and that said car was used in robbing the bank. We think there was evidence, aside from that of the accomplice, that said car was so used. Again, the accomplice testified that Dewey Welch was to meet him and his companion shortly after the robbery in the accomplice's Ford car, and that Dewey did appear at the appointed meeting place at the designated time, and witness and his companion and Dewey Welch drove back by Pickron's place in said car, leaving the stolen car in the woods at the meeting place. Mr. Pickron testified positively that Dewey Welch passed his place going in the direction of Doerun, and that shortly thereafter Dewey Welch and two other men, one of whom witness thought was Jimmy James, passed his place coming from the direction of Doerun in a two-passenger Ford car with a rumble seat behind, and a setter dog standing in the rumble seat. In this connection, it will be recalled that the accomplice swore that there were two bird dogs on the rear

seat of the Ford car in which he and his two companions passed Pickron's place. It may also be observed that there was positive testimony that a Chevrolet automobile was found where the accomplice said he left the stolen car, and that there was evidence leading strongly to the conclusion that the other car left the meeting place and came on towards Albany. Other features of the evidence might be mentioned, but we think we have stated enough circumstances to sustain our conclusion that the jury was warranted in believing that Dewey Welch "procured" the perpetration of the principal crime and was an accessory before the fact to its commission. We hold that the evidence supports the verdict.

The trial judge certifies that "the charges complained of in the first ground of the amended motion were given by request" of counsel for plaintiff in error. In view of this certification the first special ground will not be considered.

The second special ground is merely an elaboration of the general grounds, and will not be separately considered.

In the third special ground complaint is made of a long charge wherein the court substantially instructed the jury that if they believed there was a conspiracy between Dewey Welch, Jimmy James, and Mote Welch to rob the Norman Park Banking Company, and that such conspiracy was executed under the counsel, advice, and procurement of Dewey Welch, and Dewey Welch was to meet Mote Welch and Jimmy James after the robbery, and the robbery was a part of the conspiracy, and Dewey Welch did meet the principal offenders and aid them to get away and avoid detection, Dewey Welch would be an accessory before the fact to the crime. An accessory before the fact is a conspirator (*Kearce* v. *State*, supra), and our view is that there was evidence to support the charge on conspiracy. We therefore hold that there is no merit in the first contention, that "there is no evidence in the case of the fact of a conspiracy." We hold also that there is no merit in the following assignment of error: "To charge upon the subject of a conspiracy when there was no evidence upon which to base such charge except that of an accomplice, amounts to an expression of opinion by the court that the jury would be authorized to accept as true the evidence of such accomplice as to the existence of such conspiracy." While the charge contains some repetition and is not as concise as might be desired, we do not think that it is

fairly subject to the criticism that it is "argumentative, and amounts to an expression of opinion of the court." The next assignment of error, based upon the contention that "conspiracy was not involved in the case," and that the court overemphasized that term, discloses no cause for reversing the judgment. The next insistence that the court erred in summing up the case favorably to the State, "when nothing in behalf of the defendant is mentioned," is not ground for reversal. The next assignment, that the charge was error in law "in that if all of the facts stated . . were found to be true . . the defendant would not, as a matter of law, be guilty of accessory before the fact," is not meritorious.

Since the fourth special ground complains of a charge pertaining to accessories after the fact, and the court certifies that "the charge on accessories after the fact . . was requested in writing by . . counsel for the defendant," the ground will not be considered.

The fifth special ground is that there was no evidence to show that "the crime with which the defendant was charged . . was committed in Colquitt County, the county in which the defendant was being tried, and in which it is alleged in said indictment that said crime was committed," and that "there is no proof of venue in said case." A careful examination of the record shows that while there was positive proof that the robbery was committed in Colquitt County, Georgia, there is no evidence to show in what county the accessory procured the crime to be committed. If the venue of a felony committed by an accessory before the fact is the county where the principal crime is committed, the venue in this case is proved, while if the venue of such an offense is the county where the accessorial act is committed, the venue is not proved. "All criminal cases shall be tried in the county where the crime was committed, except cases in the superior courts where the judge is satisfied that an impartial jury can not be obtained in such county . . " Penal Code (1910), § 29; Civil Code (1910), § 6543. It seems to be unquestioned that "where a person procures the commission of a crime in one county through the agency of an innocent person, he is a principal, and indictable in the county where the crime was committed, although he was never in such county." 16 Corpus Juris, 200, § 300. See also *Carter* v. *State*, 143 *Ga.* 632 (3), 640, 641 (85 S. E. 884). Again, since all who take part

in misdemeanors are principals, all are indictable and triable in the county where the offense is committed. 16 C. J. 201, § 301; *Duckett* v. *State,* 93 *Ga.* 415 (21 S. E. 73). But in the case at bar we are considering an instance in which the offense is a felony and the principal actors were not "innocent agents," and a situation like this does not seem to have been passed upon by the courts of this State. "An accessory is one who is not the chief actor in the offense, nor present at its performance, but is in some way connected therein, either before or after the act committed." Penal Code (1910), § 44. "An accessory before the fact is one who, being absent at the time of the crime committed, doth yet procure, counsel, or command another to commit a crime." Penal Code (1910), § 45. "An accessory before the fact, except where it is otherwise provided, shall receive the same punishment that is prescribed for the principal in the first degree." Penal Code (1910), § 46. In *Cantrell* v. *State,* 141 *Ga.* 98, 103 (80 S. E. 649), the Supreme Court says: "The truth is that the keeping up of the distinction between principals in the first and second degree and principals and accessories before the fact, where they are all punished alike, is an archaic technicality and, as Mr. Bishop declares, 'a crystalized blunder.'" We quote from the headnotes of the case of Carlisle *v.* State, 31 Tex. Cr. 537 (21 S. W. 358): "In this State there is no difference between the punishment of an accomplice and a principal, because the crime is the same, and the legal maxim, 'Qui facit per alium facit per se,' is of universal application both in civil and criminal cases. . . Where all the acts constituting the defendant an accomplice were committed in the county of C., but the homicide was committed by the principal in the county of G., *held,* that the district court of G. County had jurisdiction to try the accomplice for the murder committed by the principal in that county." In that decision, after stating the opposite rule, the court said: "There is another line of authorities resting upon solid foundation. The doctrine is this: That distinctions between accessories and principals rest solely in authority, being without foundation either in natural reason or the ordinary doctrine of law; for the general rule of law is, that what one does through another's agency is to be regarded as done by himself. In this State there is no distinction between the punishment of an accomplice and a principal. Why? Because the crime is the

same. . . That the crime committed by the accomplice is the same as committed by his principal is evident. This proposition rests upon solid legal ground. In Broom's Legal Maxims (2d ed.) 643, we find this maxim: 'The principle of common law, "qui facit per alium, facit per se," is of universal application in both criminal and civil cases.'"

The indictment in the case at bar is in one count, charging that Jimmy James and Mote Welch committed the offense of robbery in Colquitt County, Georgia, and that Dewey Welch was an accessory before the fact to the crime, i. e., procured its commission. There is no separate crime of "accessory before the fact" in Georgia. In the case of *Powers* v. *State*, 172 *Ga.* 1, 7, 8 (157 S. E. 195), an indictment was demurred to because "it does not allege where she did procure, counsel and command the said Earl Manchester to commit the said crime of murder." On page 8 of that decision the court held that it was not necessary that it should be alleged "where she was when she counseled and commanded the commission of the crime." While this ruling was upon demurrer, and is not necessarily controlling upon the matter under consideration, yet it seems to bear upon it. Since it would appear that if it is not necessary to allege in the indictment where the accessorial act was committed, it would not be essential to prove where the "procurement" occurred. Our conclusion is that the venue of the offense committed by the accessory before the fact is Colquitt County, the place where the principal offense was committed. It follows that there is no merit in this special ground.

It appears from ground 6 that the judge recalled the jury for the purpose of charging them "the law with respect to accessories after the fact," and that in instructing the jury upon that subject he repeated much of the charge he had already given on accessories before the fact. In view of the judge's certification that "the charge on accessory after the fact . . was requested in writing by . . counsel for the defendant," the accused can not complain that such charge was improperly given because "not even charged in the indictment." Neither do we think that the charge complained of discloses reversible error for the reason that it amounted to an expression of opinion on the part of the court, or because it in effect instructed the jury that Colquitt county was the proper place for the accessory to be tried, or for any other reason.

In special ground 7 it is averred that the court erred in recalling the jury and charging them as follows: "I hope you will go bac'. to your room and reason together in an honest endeavor to reach a verdict consistent with the truth, and let it be returned. You are all good men, and this is an issue which must be settled by somebody, one way or the other. Jurors should not be arbitrary and stubborn. They should be patriotic and enter into a service in an honest endeavor to reach a verdict that speaks the truth of the case. I hope you will go back and reason together and get a verdict that represents the truth of this case and let it be returned. I will ask you all to do that." The gist of the assignment of error is that the charge "amounted to coercing honest jurors to yield their convictions rather than be publicly denounced by the court as arbitrary and stubborn." In *Padgett* v. *State*, 176 *Ga.* 314, 325, 326 (168 S. E. 53), the trial judge in the instant case recalled the jury twice and gave them instructions very similar to the charge in this case, and these charges were held to be no cause for reversing the judgment. We hold that the ground discloses no cause for reversal in the case at bar.

Special grounds 8, 9, and 10 are merely elaborations of the general grounds, which have already been passed upon.

*Judgment affirmed. Broyles, C. J., and Guerry, J., concur.*