23744. COBB v. THE STATE.

ARGUED OCTOBER 11, 1966—DECIDED NOVEMBER 10, 1966—
REHEARING DENIED NOVEMBER 23, 1966.

*Howard Moore, Jr., Horace T. Ward,* for appellant.

*Jack J. Gautier, Solicitor General, Fred Hasty, George D. Lawrence, Solicitor General, Arthur K. Bolton, Attorney General, G. Ernest Tidwell, Executive Assistant Attorney General, Hardaway Young,* for appellee.

GRICE, Justice. This appeal is by Preston Cobb, Jr., from his conviction for the June 1, 1961, murder of Frank Coleman Dumas. Appellant complains of the overruling of his challenges to the arrays of the grand and traverse juries put upon him, the overruling of his special demurrer to the indictment, and the denial of his motion for new trial.

He was first indicted in 1961 by the grand jury of Jasper County for the slaying of Dumas, an elderly white man, was tried in the superior court of that county, found guilty and sentenced to death. In his motion for new trial he complained for the first time of systematic exclusion of Negroes from the grand and traverse juries. Upon the overruling of that motion, he brought his case to this court. We held that by not raising that issue earlier he had waived it. *Cobb v. State,* 218 Ga. 10 (126 SE2d 231). The Supreme Court of the United States denied his application for certiorari. Cobb v. Georgia, 371 U. S. 948 (83 SC 499, 9 LE2d 497). Later we affirmed the denial of his extraordinary motion for new trial based upon newly discovered evidence. *Cobb v. State,* 219 Ga. 388 (133 SE2d 596).

Subsequently, the United States District Court for the Southern District of Georgia denied his claim, made in a habeas

corpus proceeding, that Negroes had been arbitrarily and systematically excluded from the grand and traverse juries which indicted and tried him, but the United States Court of Appeals for the Fifth Circuit reversed. Cobb v. Balkcom, 339 F2d 95 (CCA 5).

Thereupon, he was reindicted by the grand jury of Jasper County in February 1965. His challenge to the array of that grand jury, asserting "systematic and arbitrary exclusion and limited inclusion of Negroes," was overruled by the superior court of that county. He then made a motion for a change of venue, which was granted, and it was directed that trial take place in the Superior Court of Bibb County. There he interposed a challenge to the array of traverse jurors upon the ground of arbitrary and systematic exclusion and token inclusion of Negroes. This challenge was also overruled.

The jury returned a verdict of guilty, but with a recommendation of mercy, and accordingly he was sentenced to life imprisonment. Following the denial of his motion for new trial he appealed to this court, enumerating as error the rulings hereinbefore referred to.

■ We deal first with appellant's complaints as to the grand jury of Jasper County which reindicted him in February 1965, and as to the traverse jury of Bibb County which tried him in April 1965. He urges that he was denied due process of law as guaranteed by the State and Federal Constitutions and the protection of citizens as guaranteed by the State Constitution because of arbitrary and systematic exclusion and inclusion of Negroes from these juries due to race or color.

As to these complaints, he makes two main contentions. The first is that the persons eligible for grand jury service in Jasper County and for traverse jury service in Bibb County, at the time of his last indictment and trial, were selected from the tax digests which, pursuant to State statute, were organized and maintained on the basis of race or color, and that therefore, the procedures by which the jury lists were selected were inherently discriminatory. The second contention, basically, is that on each such list the percentage of Negroes was disproportionate to the percentage of Negro population of that county.

These contentions have previously been dealt with by this court and by the Supreme Court of the United States and found not valid. They need not be elaborated upon here. See *Heard v. State*, 210 Ga. 523 (81 SE2d 467); *Brookins v. State*, 221 Ga. 181 (144 SE2d 83); Brown v. Allen, 344 U. S. 443 (73 SC 397, 97 LE 469); Swain v. Alabama, 380 U. S. 202 (85 SC 824, 13 LE2d 759).

The situation found by the court in Cobb v. Balkcom, 339 F2d 95, supra, to exist in Jasper County, i.e., no Negroes serving on grand or traverse juries, was promptly remedied by the jury commissioners of that county. In Bibb County Negroes have been placed on jury lists and have served as jurors for many years.

From a study of this record as to the selection of these 1965 grand and traverse juries, we find that the officials charged with that responsibility properly discharged their duties. Each jury commissioner testified that the jury list was selected without regard to race or color. By law (*Code Ann.* § 59-106) they were required to select "upright and intelligent citizens" as traverse jurors and "the most experienced, intelligent, and upright citizens" as grand jurors. They were not required to depart from those time tested standards of uprightness, intelligence and experience in order to achieve some arbitrary ratio based upon race. That kind of selection would greatly impair the very foundation of the fact finding process, which is essential to the proper administration of justice. What was said in the Swain case, 380 U. S. 202, supra, applies here: "There is no evidence that the commissioners applied different standards of qualifications to the Negro community than they did to the white community."

The challenges to the arrays are clearly not meritorious.

■  We next deal with the overruling of appellant's special demurrer to the indictment. The indictment, insofar as material here, charged that the appellant "did kill and murder, by shooting the [deceased] with a certain gun which the said [appellant] then and there held. . ." He urges that the language "with a certain gun" is insufficient to enable him to make an adequate defense, in that it is too vague a description of the weapon allegedly used.

This position cannot be maintained.

The term "gun" appears in a number of our statutes defining crimes. See *Code* §§ 26-1702, 26-5107, 26-7301, 26-7308, and 26-7311. For descriptions, comparable in principle, which have been upheld against attack on the ground of vagueness, see *Bowens v. State,* 106 Ga. 760 (1) (32 SE 666), and *Wilson v. State,* 190 Ga. 824 (10 SE2d 861).

■ The appellant maintains in his motion for new trial that it was error to qualify prospective traverse jurors as to whether they were conscientiously opposed to capital punishment. He urges that this was a violation of the guarantees of impartial jury trial and due process of the Federal Constitution and of due process of the State Constitution, in that he was less than 17 years of age when the crime was allegedly committed and legislation was subsequently enacted providing that any minor less than seventeen years of age at the time of an alleged offense can not be given the death penalty. He insists that this qualification forced him to trial before a jury which did not represent a true cross-section of the community and which was more prone to convict.

The legislation referred to is a 1963 statute (Ga. L. 1963, p. 122) which amended *Code* §§ 26-1005 and 27-2302. The trial judge here properly ruled that this statute could not be given retroactive effect so as to apply to the appellant. Constitution, Art. I, Sec. III, Par. II (*Code Ann.* § 2-302); *Code* § 102-104.

This court has held that "The statute authorizing the interrogation of a juror in regard to his opposition to capital punishment does not deny a person accused of a capital crime the right to a trial by an impartial jury; neither does it deny him due process of law, or the equal protection of the laws." *Massey v. State,* 222 Ga. 143, 151 (149 SE2d 118). See also *Woolfolk v. State,* 85 Ga. 69 (9) (11 SE 814). Furthermore, appellant was not harmed by such qualification since the jury recommended mercy, thus requiring a sentence of life imprisonment rather than capital punishment.

This contention as to such qualification of the jurors cannot be sustained.

■

■ Appellant contends in his motion for new trial that the trial court erroneously ruled, during a hearing on the question of the voluntariness of certain statements by him, that the burden of proof had shifted to him to rebut a prima facie showing that such statements were voluntarily made. He claims that in light of his age, his lack of counsel, and the circumstances of his arrest the statements were not voluntary.

(a) We must first refer to the procedure employed and the action taken by the trial court in this regard. When the issue first arose the judge retired the jury. He announced that he would proceed in accordance with Jackson v. Denno, 378 U. S. 368 (84 SC 1774, 12 LE2d 908); that he would hear all evidence that either side desired to submit; and that at the conclusion he would make a definitive ruling of his own as to whether or not the statements were voluntary, permitting them to go to the jury if voluntary but excluding them if not. He stressed that he was "not simply conducting a hearing as to prima facie admissibility." Thereupon both the State and the appellant introduced evidence upon this issue.

At the conclusion of all such evidence, the judge again referred to the Denno case, supra, and ruled as follows: ". . . there has been no technical legal objection sufficient to vitiate or rather render inadmissible the alleged incriminatory statement [at Jackson] or the alleged confession [at Gray], and the court is holding as a matter of fact, after a full and definitive determination from a consideration of all the facts . . . that the statements are or were voluntarily made . . . and therefore are admissible, both legally and factually, and the court is making as I said more than a prima facie determination but an actual definitive determination. . ."

Subsequently, in his charge to the jury the judge submitted to them for their determination the question of voluntariness of the statements.

This procedure was in strict accordance with that sanctioned by the Denno decision, 378 U. S. 368, supra. In voiding the New York procedure, the court approved that of Massachusetts. It declared: "In jurisdictions following [the Massachusetts rule], the judge hears the confession evidence, himself resolves evi-

dentiary conflicts and gives his own answer to the coercion issue, rejecting confessions he deems involuntary and admitting only those he believes voluntary. It is only the latter confessions that are heard by the jury, which may then, under this procedure, disagree with the judge, find the confession involuntary and ignore it. Given the integrity of the preliminary proceedings before the judge, the Massachusetts procedure does not, in our opinion, pose hazards to the rights of a defendant. . ." (Footnote 8).

(b) We now consider the significant evidence which the judge had before him in determining voluntariness.

Appellant was at the time of the homicide fifteen years of age and earlier that year had dropped out of the ninth grade of school. Nothing appears in the record as to any abnormality, physical or mental.

What occurred at Jackson may be summarized as follows. Appellant was brought there about noon from Monticello, the county site of Jasper County, some 18 or 19 miles away, where he had remained for only a few minutes immediately after he was apprehended. When he arrived at Jackson he was questioned in the sheriff's office for about 15 or 30 minutes. Four officers were present. They testified that before any questions were asked he was told that he did not have to say anything, that anything he said could be used for or against him, that he had the right to a lawyer, and that he replied that he did not want a lawyer. They related that the questioning was in normal tones of voice, that no threats or promises were made to him, that he appeared normal and did not appear to be scared, and that no one offered to get him a lawyer or to contact his family. They swore that he willingly told them where the deceased's body was. Appellant, on the other hand, testified that nothing about a lawyer was mentioned, that when they first asked him where the body was he did not answer and was beaten by several officers with their fists and with sticks, that they told him they "would beat it out of him," and that he then told them where it was. The officers denied that any beating occurred.

Events transpiring at Gray, insofar as pertinent here, are those which follow. Appellant was brought there in the early after-

noon from Jackson, about 30 miles way. At Gray he was questioned in the presence of four or five officers, together with the State's prosecuting attorney. While the duration of this questioning does not appear specifically there is nothing to indicate that it was protracted. The officers who were present stated that at the outset the appellant was again told that he did not have to say anything, that anything he said could be used either for or against him, that he had the right to a lawyer but that he said he did not want one and that no one offered to get him a lawyer or to contact his family but that he was not denied any request to make a telephone call. They testified that questions were in normal tones of voice, that no threats or promises were made to him, that they did not mistreat him in any way, that he acted as if nothing was wrong and did not seem remorseful. One of them swore that he wrote down what appellant told them about the homicide. Appellant testified, however, that they told him if he did not answer the questions they would have to beat him again.

We have reached the conclusion that the determination which the trial judge made was correct. No decision from this court with similar facts has been brought to our attention. Appellant has urged that several from the Supreme Court of the United States require a ruling to the contrary. However, the facts in those are significantly different from the ones here. The fact that appellant was then 15 years old did not, under the circumstances here, require that his statements be declared inadmissible. Nor does his race preclude them from being testified to, since there is no indication that this was a factor. From all that appears he was not denied any of his rights, and the statements were voluntary. See *Code* § 38-411.

■ Appellant contends further in his motion for new trial that it was error to permit a State's witness to swear from the notes made by the witness as to a statement allegedly made by him at Gray, that it was also error to overrule his objection to the admission of testimony as to that statement and also as to the one allegedly made at Jackson. He urges that such statements were obtained by illegal arrest, search and seizure, and denial of counsel, in violation of the Fourth, Fifth, Sixth and

Fourteenth Amendments to the Federal Constitution and Art. I, Sec. I, Par. V of the State Constitution, and thus were not voluntary. What we have ruled in Division 4, supra, controls adversely to appellant in this contention.

■ Two other grounds of the motion may be treated together. The first is that the trial court erroneously permitted a witness to swear from a paper without an adequate foundation being laid that he needed to refresh and assist his memory by use of the paper. The second is that it erred in denying the appellant's motion to exclude all of this witness's testimony based upon written notes of statements allegedly made by the appellant, upon the above objection and also because the witness gave the notes to a second person and got them back from a third, and therefore no authenticity was shown.

These grounds are not valid.

This witness testified that he wrote on the paper what the appellant had stated and was willing to swear from the paper. Thus, no foundation as to his need to refresh and assist his memory was necessary, because there was compliance with *Code* § 38-1707, which provides: "A witness may refresh and assist his memory by the use of any written instrument or memorandum, provided he finally shall speak from his recollection thus refreshed, *or shall be willing to swear positively from the paper.*" (Emphasis supplied.)

As to authenticity of the notes, this witness testified that these were the ones he made, in his own handwriting and initialed by him and others immediately upon being written as spoken by the appellant. Another person traced the whereabouts of the notes from this witness until their return to him.

■ In separate grounds of his motion appellant complains of the admission in evidence of a pistol and a rifle, asserting that the pistol was not identified as the weapon that killed the deceased or shown to be the one in the possession of appellant; and that the rifle was not identified as the weapon that killed the deceased or shown to be the one connected with the alleged confession of the appellant, and also that the testimony of the ballistics expert showed that the rifle was not the murder weapon.

However, we find from the evidence ample identification as

to both firearms. A .22 caliber bullet was removed from the body of the deceased, but according to a ballistics expert, it was so mutilated that he was not able to ascertain with certainty whether it came from the rifle or from the pistol. It was his opinion that the rifle was "probably excluded." A store operator testified that on the afternoon of the date of the homicide the appellant bought a box of .22 caliber cartridges. A girl who rode for awhile on the night of the homicide with the appellant in the deceased's station wagon related that he showed her a pistol. A boy, Marshall Tinsley, who spent the night with appellant in the deceased's station wagon testified that a pistol and a rifle were in it then. The officer who brought the station wagon to the jail after the appellant was apprehended saw a pistol and a rifle in it, and upon being shown the rifle and pistol which were introduced in evidence, testified that the rifle was the same make and general type as the one he saw in the station wagon and that the pistol looked like the one he saw there. The successive custody of these weapons, from their removal from the vehicle to their production at the trial, was accounted for prior to their introduction in evidence.

In view of all of this evidence, it was for the jury to decide whether either of these guns was the weapon with which the deceased was shot and killed. See *Powers v. State,* 172 Ga. 1 (15) (157 SE 195) ; *Downs v. State,* 208 Ga. 619 (3), 622 (68 SE2d 568) ; *Seymour v. State,* 210 Ga. 571 (6) (81 SE2d 808) ; *Wilson v. State,* 215 Ga. 782 (2) (113 SE2d 447).

■ Appellant also contends in his motion that the court erroneously instructed the jury that they could return a verdict fixing his punishment, in violation of the due process and equal protection clauses of the Federal Constitution and also of his civil rights as set forth in 42 USC, § 1981. He maintains that the procedure requiring the same body which determines guilt or innocence to fix also the punishment is not reasonably calculated to reach a specific, distinct and reliable determination of guilt unmixed with consideration of the objects of punishment. For this complaint he relies upon Jackson v. Denno, 378 U. S. 368, supra, urging that it requires that in a state criminal prosecution procedures must be employed which result in a reliable deter-

mination of guilt or innocence independent of any collateral issues. However, the collateral issue in that decision was the voluntariness of the defendant's confession, not the procedure now complained of. That case is not applicable here. Furthermore, no harm resulted to the appellant from the charge complained of, because as the result of the jury's recommendation he received the least punishment possible for murder, life imprisonment. This ground is not meritorious.

■ The ground of the motion asserting that no witness at the trial identified the appellant as being the defendant in the case cannot be sustained because of obvious lack of merit. He was amply identified.

■ There was sufficient evidence to authorize the verdict of guilty, and therefore the general grounds of the motion for new trial were properly overruled.

The incriminatory admission made at Jackson and the full confession made later in the day at Gray, together with the finding of the deceased's body, are ample to sustain the finding.

However, independently of the admission and confession, numerous facts were proved so as to authorize the verdict. We refer to the salient ones now.

A visitor testified that the deceased was at home on the late afternoon of June 1, 1961. The deceased's wife stated that she had told the appellant that she would not be at home that night. A merchant swore that in mid-afternoon appellant bought a box of .22 caliber cartridges. A neighbor related that appellant walked past his house toward the Dumas place at about sundown.

Several witnesses saw the appellant in possession of the deceased's station wagon that night. Marshall Tinsley said that he met him in it at about 8:30 or 9 p.m. and remained with him until they were apprehended the next morning. He stated that he noticed a rifle and a pistol in it. Another occupant saw blood spots toward the rear of it, and appellant explained that they had been deer hunting. A girl companion riding in the vehicle testified that he showed her the pistol. On the following morning, June 2, 1961, Tinsley observed that appellant changed papers from one billfold to another and put one behind a log.

Early that morning numerous blood spots were found in the deceased's home, and the station wagon was ascertained to be missing.

A deputy sheriff related that later in the morning he encountered appellant and Tinsley in the station wagon; that he saw blood spots in it; that he found in it a .22 caliber pistol, a .22 caliber rifle and also a hat of the deceased; that the pistol contained five live cartridges and one which was spent; that he recovered from appellant a $20 gold piece later identified as that of the deceased. Tinsley pointed out to another deputy sheriff the place he had seen appellant hide the billfold, and it was recovered and identified as belonging to the deceased.

The deceased's body was found in a ditch at the location where appellant said he had put it.

An agent of the State Crime Laboratory testified that he recovered a .22 caliber bullet from the head of the deceased, that he performed tests on the trousers worn by appellant on the night of the homicide and that they showed the presence of human blood.

Tinsley testified that on the afternoon of June 2, 1961, while he and appellant were in the same jail cell he asked appellant "why didn't he tell me he had killed someone," and that appellant replied that he was "sorry that he didn't tell me what he had done, he said the reason he didn't he didn't want me, he thought I would get out and . . . I would whip him if he had told me." Tinsley also swore that later, before the first trial, appellant told other prisoners that "he had done killed the white man," that he thought the appellant said "he walked in the house and told [the deceased] something about that he found out where the cows were getting out or something and walked back to the door, I think and got the rifle or pistol one and shot him . . . had been up above the house at a pine tree . . . waiting for his mother to go home."

A deputy sheriff testified that he heard appellant, while in the courthouse awaiting a hearing on his motion for new trial, tell another prisoner that he had "reached under his arms and under his legs and picked [the deceased] up and put him in the back of the station wagon." Another officer verified this and added

that appellant also said that "he shot this fellow and that how he picked him up and carried him. . ."

At his first trial appellant, in his unsworn statement, said: "I want to tell them that I am sorry and he kept telling me about he was going to blow my brains out and then I got mad, then I made up my mind to kill him and after I did, I was sorry. . . . I was mad with him because he kept telling me about that little ole fish I caught and he told me he was going to blow my brains out. . ." In response to questions by his counsel upon that trial, appellant also stated that he was afraid of the deceased before, but was not afraid of him the day he "did it," and that he shot him with a pistol with a .22 long hollow point bullet.

The foregoing facts were established by witnesses which the State produced. The appellant did not present any evidence and did not make an unsworn statement.

No effort was made by his counsel to show that he, then 15 years old, was not criminally responsible. In this connection, our law provides: "A person shall be considered of sound mind who is neither an idiot, a lunatic, nor afflicted with insanity, and who has arrived at the age of 14 years, or before that age if such person know the distinction·between good and evil." *Code* § 26-301.

As we view it, the evidence of appellant's guilt was overwhelming, and amply sustains the jury's verdict.

A study of the evidence causes one to reflect upon the dual nature of the tragedy which it describes. From the standpoint of the deceased it is tragic since he, an elderly citizen of the State, was deprived of his right to live out his natural life as the evening shadows lengthened. Viewing it from the vantage point of the appellant, it is sad that he, a youth in the morning of his life, decided upon a heinous deed which so radically changed its course.

The jury in the trial in Bibb County no doubt gave full consideration to his age in deciding to return a verdict recommending him to the mercy of the court.

We have carefully examined this record and find that no error was committed by the extremely capable jurist who was

called back from judicial retirement to preside over this difficult trial.

*Judgments affirmed.   All the Justices concur.*