## 28954. JORDON v. THE STATE.

ARGUED JUNE 12, 1974 — DECIDED SEPTEMBER 17, 1974.

*Grace W. Thomas,* for appellant.

*Lewis R. Slaton, District Attorney, Joseph J. Drolet, Assistant District Attorney, Arthur K. Bolton, Attorney General, Thomas P. Burke, Deputy Assistant Attorney General,* for appellee.

GRICE, Chief Justice.

Jack Jordon was convicted of murder in the Superior Court of Fulton County, and sentenced to life imprisonment. He appeals from the verdict and sentence, and enumerates fourteen alleged errors, which include the grounds of his motion for new trial, as amended.

The state's evidence, in brief, is that which follows.

Henrietta Weaver testified: On the date of the homicide the appellant and his wife, Jacqueline, and the witness and James Bell, the deceased, (who lived in the apartment with the witness), had been to a "political" party. They came back to the witness' apartment at about 2:00 a.m. The appellant and the deceased went out together. After they came back, the deceased went to bed. The witness was talking with the appellant and his wife, and stated that the daughter of the deceased had gotten fat. The deceased jumped up and said, "What you talking about my child for?" The deceased started cursing and pulled a knife on the witness. The appellant told his wife and the witness to go out on the porch, that he would "cool him down." They went outside, and heard tussling and some glass. They heard somebody running down the steps and thought it might be the deceased, so they ran behind the building. The appellant came out of the building, jumped in his car, and drove off very fast. The appellant's wife kept calling him and he would not stop. She suggested that they get a cab and go to her home, and come back in the morning, stating that the deceased might be all right then. The witness, her daughter, and a baby she was keeping, went with the appellant's wife to her home. The witness left because she knew the deceased was drunk and she thought the appellant was trying to "cool" him down. She did not learn that the deceased was dead until about 9:00 that morning. The deceased was a larger man than the appellant.

Regina Weaver, the daughter of Henrietta Weaver, testified: When she woke up the baby was crying, and the deceased was telling the appellant to get out, and he would not get out. She saw them scuffling on the floor. The deceased pushed the appellant out the door. After the appellant left she went with her mother to the home of

the appellant. While they were in the cab she saw the appellant in his car driving back toward her mother's apartment. After the fight, she saw a green vase and a prayer plate that were broken.

The police officer who first investigated the homicide testified: When he arrived on the scene the appellant was standing on the sidewalk, and he said that somebody was shot. The appellant took him to the dead body. He asked the appellant if he knew anything about it, and the appellant replied that they had been fighting and he shot the deceased.

The second officer investigating the homicide testified: The appellant stated to him that he shot the deceased with a pistol and the pistol was in his car. The appellant gave him the keys to his car, and the witness found the pistol. The appellant told him that they had a fight, and he left and came back; that they got in another fight and he shot him.

Mr. Dubose, of the Atlanta Police Department, testified that he interviewed the appellant, and the appellant made a written statement, after being advised of his constitutional rights. The material part of this statement follows.

"On Saturday night, 8/25/73, shortly after 10:00 p.m., me and Jacquelyn, my wife, went over to Henrietta Weaver's apartment . . . When we got there we picked up Henrietta and James [the deceased] and went to a political party on Canola Drive. We stayed there until around 1:00 a.m., 8/26/73.

"After we left the party, we went back to the apartment on Dargan Place. When we got there, we talked for about five minutes. Then me and James went down on Auburn Avenue and got a beer. Then we went back to the apartment.

"When we got back to the apartment we went in and sat down and Henrietta told James not to turn the record player too loud because it might wake the baby. Then James said, 'I'm going to bed anyway,' and went into the bedroom. After James went into the bedroom my wife asked me if I wasn't about ready to go and I said yes. Then we got up and my wife and Henrietta started talking. Then Henrietta said, 'James' little girl's back is wide and

fat.' Then James came out of the bedroom and said, 'I been listening to what y'all said about my daughter.' Then James started getting onto Henrietta and I told James, 'Man, don't get yourself in any trouble over that.' Then James asked me what I had to do with it and I told him I didn't have anything to do with it but it wasn't worth him getting in trouble over that.

"Then James grabbed me and I grabbed him and we started tussling around the living room. While we were tussling, I saw a pocketknife in James' hand. My wife told me, 'He's got a knife Jack,' and I told my wife to go on downstairs and her and Henrietta went on downstairs.

"After my wife and Henrietta went on downstairs Henrietta's daughter came out of the bedroom with the baby and said, 'Why don't y'all stop that?' I told her to tell James to stop, that I couldn't stop because I wasn't going to let James hurt me. Then James got a bowl from somewhere, I don't know where he got it from, and he hit me in the head with it two times on the left side of the head. Then I ran down the stairs to my car. When I got to my car I opened the trunk and got my gun a .22 revolver. After I got the gun out of my trunk I went back up to the corner of the apartment building and James was coming down the steps. I told James I had took all I could take and if he came down on me I was going to kill him. I didn't see anything in his hands, but he kept coming. James said something to me but I don't remember what it was. When James got to the bottom of the steps, I told him not to come on me no further but he kept coming and I fired. I don't know if I hit James or not, but when I fired he went around the front of a black Cutlass Supreme Oldsmobile. When James went around the front of the car, I went to the back and fired at him again across the trunk. When I fired this time, James fell. I don't know exactly how many shots I fired. Then I went around and looked at James. After I looked at James I backed away from him. Then I reloaded the gun and went to a pay phone at the corner of Holderness and Lucille Avenue and called the police.

"When the police got there, I told them that a man had been killed and we went back down to where James was. When we got back down there, the police shined his

light on James and I told the police that I was the victim. I haven't seen my wife or Henrietta since they went down the stairs when me and James was tussling . . ."

■ In enumerated errors 3 and 4 the appellant complains of the sustaining of the state's objections to the questions of counsel for the appellant, on cross examination of the state's witness Henrietta Weaver, as to whether this witness saw the deceased on a specified date shoot Dan Tucker with a pistol; whether she had ever had to take her gun away from the deceased, or have someone else take it away from him; and whether it was the customary behavior of the deceased to pull a knife on her. It is asserted that counsel should have been allowed to pursue these questions to show the character of the deceased for violence.

The character of the deceased for violence can not be established by proof of specific acts. *Andrews v. State,* 118 Ga. 1, 3 (43 SE 852); *Warrick v. State,* 125 Ga. 133, 141 (53 SE 1027); *Smithwick v. State,* 199 Ga. 292, 295 (1) (34 SE2d 28); *Black v. State,* 230 Ga. 614 (3) (198 SE2d 314).

It was not error to refuse to allow the witness to answer these questions.

■ It is asserted in enumerated error 5 that the court erred in admitting in evidence the statement made by the appellant while he was in custody, over the objection that he was not represented by counsel at the time the statement was made.

A separate hearing was held on the admission of this statement. The officer taking the statement testified that he fully advised the appellant of his constitutional rights, including the right to counsel while making any statement, and the right to have counsel appointed; that the appellant stated that he fully understood his rights; and that the appellant signed a written waiver of these rights.

The trial judge was authorized to find from the evidence submitted that the appellant knowingly waived his right to counsel while making the statement, and that the statement was voluntary and admissible.

■ Enumerated error 6 asserts that the court erred in permitting the assistant district attorney, in the cross

examination of witnesses testifying in regard to the appellant's good character, to ask them if they knew the appellant on January 16, 1957.

It is argued by counsel for the appellant that the questions of the prosecuting attorney attacked the appellant's character by innuendo.

Counsel for the appellant had made a pretrial motion to suppress the record of the appellant's sentence for rape on January 16, 1957, which was entered on his plea of guilty without the benefit of counsel. The trial judge ruled that the conviction could not be used to impeach the evidence of witnesses in regard to the general good character of the appellant. See *Turner v. Hopper,* 231 Ga. 672 (203 SE2d 481).

We do not approve the questions of the prosecuting attorney, referring to the date of the sentence which could not be legally used to attack the general character of the appellant. However, the sentence was not introduced in evidence and the date had no significance to the jury. We find no reversible error in permitting the prosecuting attorney to ask these questions.

■ Enumerated error 7 asserts that the court erred in failing to charge, as requested, Code Ann. § 26-705 (Ga. L. 1968, pp. 1249, 1270; Ga. L. 1969, pp. 857, 859), which provides: "A person shall not be found guilty of a crime if the act or omission to act constituting the crime was induced by a misapprehension of fact, which, if true, would have justified the act or omission."

The trial judge fully charged on justifiable homicide, and it was not error to refuse to charge in the language of Code Ann. § 26-705. *McClendon v. State,* 231 Ga. 47 (4) (199 SE2d 904).

■ In enumerated error 8 it is contended that the court erroneously shifted the burden of proof to the appellant by the following charge: "If a defendant raises an affirmative defense, he assumes the burden as to that defense, although he need carry the burden of persuasion only by a preponderance of the evidence."

In enumerated error 13 it is contended that the court erred in giving the following charge: "When the State's evidence shows the commission of the homicide by the accused, by the use of a deadly weapon the law presumes

murder." It is asserted that the court should have charged that this was a rebuttable presumption and that the appellant claimed self-defense.

While language in charges similar to these quoted excerpts have been approved by this court (for instance see *Fisher v. State,* 228 Ga. 100 (2) (184 SE2d 156); *Chandle v. State,* 230 Ga. 574 (3) (198 SE2d 289)), these instructions were not adjusted to the evidence in the present case. The only evidence offered by the state to prove that the appellant committed the homicide by the use of a deadly weapon was that of police officers who testified concerning the oral and written statements, of the appellant. In all of these statements, except one, the admission of the homicide was accompanied by an exculpatory explanation from which the jury could have found either that the homicide was justified, or that the appellant was guilty only of voluntary manslaughter.

Where any of the state's evidence shows mitigating circumstances, justification, or alleviation, it is error to charge that malice will be presumed from the commission of the homicide with a deadly weapon, and that the burden rests upon the accused to show justification or mitigation. See: *Mann v. State,* 124 Ga. 760 (1) (53 SE 324, 4 LRA (NS) 934); *Delk v. State,* 135 Ga. 312 (1) (69 SE 541); *Surles v. State,* 148 Ga. 537 (1) (97 SE 538); *Burley v. State,* 158 Ga. 849 (2) (124 SE 532); *Eich v. State,* 169 Ga. 425 (4) (150 SE 579); *Miller v. State,* 184 Ga. 336, 338 (191 SE 115); *Smithey v. State,* 219 Ga. 247 (3) (132 SE2d 666); *Williams v. Johnson,* 225 Ga. 654 (3) (171 SE2d 145).

Under the facts of the present case the excerpts from the charge complained of were erroneous and will require the grant of a new trial.

■ Enumerated error 9 asserts that the court erred in failing to exclude improper remarks of the prosecuting attorney in his argument to the jury.

No objection was made to these statements at the time they were made, and they can not be the basis for review. *Daniels v. State,* 230 Ga. 126 (2) (195 SE2d 900).

■ Enumerated error 14 contends that the court erred in refusing to charge any of the written requests submitted by the appellant's counsel.

The principles contained in these requested charges were adequately covered by the charge given by the court, and there is no merit in this contention.

■ Enumerated error 10 asserts that the court erred in not directing a verdict for the appellant. Enumerated error 11 contends that the court erred in instructing the jury as to murder, since all of the evidence showed either self-defense or manslaughter.

Under the evidence in the case it was for the jury to determine whether the homicide was murder. *York v. State,* 226 Ga. 281 (174 SE2d 418). It was not error to charge on murder or to fail to direct a verdict of acquittal.

■ Enumerated error 12 contends that it was error to fail to permit the appellant's wife to testify at the grand jury hearing.

"The evidence which the grand jury receives in finding a true bill is not subject to inquiry." *Farmer v. State,* 228 Ga. 225 (3) (184 SE2d 647); *Powers v. State,* 172 Ga. 1 (3) (157 SE 195); *Buchanan v. State,* 215 Ga. 791 (2) (113 SE2d 609); *Williams v. State,* 222 Ga. 208, 212 (149 SE2d 449).

■ The grounds of the motion for new trial, as amended, are included in the enumerated errors heretofore considered. Except as held in Division 5, no error is shown in these grounds.

*Judgment reversed. All the Justices concur.*