## 39910. BRIGHT v. THE STATE.

GREGORY, Justice.

Randall Ottis Bright was convicted by a Cobb County jury of the murder of his wife, Lynda Bright, and sentenced to life imprisonment. The evidence at trial showed that at approximately 5:00 a.m. on March 9, 1982, while transporting his wife to Cobb General Hospital, the defendant lost control of his automobile and drove down an embankment located on hospital premises. When hospital security agents investigated the accident, they discovered the defendant's wife did not register a pulse. Cobb County police officials were notified and members from both the Special Activity Section responsible for investigating traffic fatalities and the homicide division[1] were dispatched to the hospital. Ultimately the investigation disclosed that while the defendant was not seriously harmed, Mrs. Bright had a number of bruises on her body and had sustained a gunshot wound in her upper back. Prior to any police questioning the defendant stated to relatives, in the presence of a police officer, that he and his wife had been having an argument while lying on an outstretched sofabed. He stated he "smelled a terrible smell and saw that [his wife] was shot."

Medical testimony indicated the victim died from a gunshot injury which severed the aorta and pierced the left lung. The medical examiner testified that during the autopsy he observed a gun muzzle impression and power burn patterns on the victim's left shoulder,

---

[1] Detective Sisson from the homicide division testified that his initial investigation of Mrs. Bright's death was to determine whether the case should be turned over to the traffic investigation unit or whether it fell under the jurisdiction of the crimes-against-persons section.

indicating the weapon had been in direct contact with the victim's body when fired. The medical examiner testified that some of the bruises on the victim's body had been sustained in the automobile accident. It was his opinion, however, that other bruises had occurred prior to the vehicular accident and were the result of a beating. Based on his examination of the victim's gunshot wound, the medical examiner opined that there was "no way" the victim could have fallen on a gun and accidentally received this injury. Forensic evidence disclosed a "low concentration" of cocaine in the victim's body.

A firearms examiner from the State Crime Lab testified that, based on his examination of the powder burns found on the victim's nightgown, the murder weapon had been held in direct contact with the garment when fired. He further testified that tests performed on the murder weapon indicated that the gun was in "good condition" and would not fire accidentally. Fellow employees of the victim testified that the victim had come to work with black eyes; that the victim had indicated the defendant had a "bad temper" and that she feared him; and that the quality of victim's work had, by the victim's own admission, deteriorated due to difficulties in her marriage.

The defendant took the witness stand in his own behalf. He testified that he suffered from a slipped disc and had been unable to work following surgery in 1980. He stated that his wife supported the two of them with one full-time and various part-time jobs, as well as performing all domestic chores and managing the family finances. The defendant testified that he supplemented the family income by raising hunting dogs, but that his wife fed and cared for the animals.

The defendant testified that the victim returned home from work at 6:00 p.m. on March 8, 1982 and immediately used some cocaine. Much later in the evening the couple discussed the difficulties the victim was having with her employment. The defendant suggested that perhaps he should leave for a few days, then went into their bedroom and fell asleep. He testified that he awakened to find his wife pointing the murder weapon in his face. She told him she did not want him to go away. A struggle ensued. The defendant wrested the gun away from the victim and placed it under the mattress. Later, when the defendant went into the living room, the victim was pointing the gun, hammer cocked, at him. The couple struggled again. The defendant took the gun from the victim and tossed it on the open sofa bed. According to the defendant, the victim lay down on top of the gun and the weapon discharged. The defendant immediately took his wife to Cobb General Hospital.

To rebut defendant's testimony of his physical incapacitation

the State introduced evidence that, subsequent to defendant's operation, he had lifted certain heavy machinery and had gone on a number of hunting and fishing expeditions.

(1) During its charge to the jury the trial court instructed, "I give you certain presumptions of law that are applicable in this case. A presumption is a conclusion which the law draws from given facts. Presumptions are rebuttable, that is, they are subject to being overcome by evidence to the contrary. I charge you that the actions of a person of sound mind and discretion are presumed to be the products of a person's will, that a person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts, but that these presumptions may be rebutted. I further charge you that the law presumes that a person intends to accomplish the natural and probable consequences of his acts. If a person uses a deadly weapon or instrument in the manner in which such weapon or instrument is ordinarily employed to produce death and thereby causes the death of a human being, the law presumes the intent to kill. This presumption may be rebutted. I further charge you that a person shall not be presumed to act with criminal intention, but that the triers of fact, that is you, the jury, may find such intention upon consideration of the words, the conduct, the demeanor and all the circumstances connected with the act for which the accused had been prosecuted.

"I charge you that the burden of proof is upon the State to prove that the act alleged to be criminal is, in fact, a criminal act beyond a reasonable doubt. Jurors, I further charge you that a specific intent to commit the crime charged in this indictment is an essential element that the State must prove beyond a reasonable doubt. Intent is always a question for the jury and is ordinarily ascertained by acts or conduct. Intention and intent may be shown in many ways, provided the jury finds that it existed from the evidence produced before them. It may be inferred from the proven circumstances or by acts and conduct or it may be presumed when it's the natural and necessary consequences of the act."

Subsequently, in response to the defendant's request to charge the law of involuntary manslaughter, the trial court charged, *"As I charged you, a man is presumed to intend the natural consequences of his acts; the natural consequences of shooting at another with a pistol where death ensues, is death. Thus, if a deadly weapon be used in a homicide in the usual and natural manner in which such weapon would produce that result, the presumption of an intention to kill would arise.* If the evidence should disclose an unintentional use of a deadly weapon in the usual and natural manner in which such weapon would produce death, such as an unintentional firing of a gun

or pistol in a tussle over its possession, if the defendant having the gun in his possession was not making an assault with intent to kill, then the offense of involuntary manslaughter would be involved, if you so find."[2]

The defendant argues that the italicized portion of this charge violates Sandstrom v. Montana, 442 U. S. 510 (99 SC 2450, 61 LE2d 39) (1979) in that (1) it creates a mandatory presumption as as to the element of intent and (2) it impermissibly shifts the burden of persuasion to him.

While in its initial charge the trial court stated that the law presumes the intent to kill where a person uses a deadly weapon in a manner ordinarily used to cause death and thereby causes death, the trial court also charged that this presumption may be rebutted. The trial court clearly charged the jury that the State bore the burden of proving beyond a reasonable doubt the essential element of intent; that a person shall not be presumed to act with criminal intent; and that intent is always a question for the jury.

Having received this background prior to the complained-of charge, we do not believe a reasonable juror would have concluded that the law required him to find the defendant possessed the intent to kill the victim upon proof that the defendant shot the victim. It is our determination that the complained-of presumption in this case is permissive rather than mandatory. Cf. *Wilson v. Zant,* 249 Ga. 373, 381 (290 SE2d 442) (1982); *Johnson v. State,* 249 Ga. 621 (292 SE2d 696) (1982). Taken in context of the trial court's entire charge, the presumption allowed, but did not require, the jury to find the defendant possessed the intent to kill the victim upon proof of facts evidencing he shot her with a deadly weapon. The presumption did not place a burden on the defendant, but merely advised "the jury as to what conclusions they might draw from the circumstantial evidence presented at trial." *Williamson v. State,* 248 Ga. 47, 54 (281 SE2d 512) (1981).

Nor do we find that the complained-of charge violated due process in that it shifted the burden of persuasion on the element of intent to the defendant. The language of the charge does not require the defendant to prove lack of intent to commit murder "by some quantum of proof," but indicates only that if the evidence showed an unintentional firing of a deadly weapon, the jury would not be permitted to draw the presumption. Rather, in that event, the jury would consider the law of involuntary manslaughter as subsequently

---

[2] The trial court gave this charge, including the challenged language, a second time in response to a jury request made during deliberation of the case.

charged by the trial court.

(2) Defendant also argues that the trial court erred in admitting statements he made to Officer Cook while at Cobb General Hospital. At approximately 5:15 a.m. Officer Roper of the crimes-against-persons division of the Cobb County Police Department was summoned to Cobb General. Upon arrival he was informed that the victim was dead and that the defendant had been taken to the emergency room for treatment. Unaware that the victim had been shot, Roper dispatched a fellow officer to attend the victim. Roper cautioned the officer to "not open conversation" with the defendant, but that if "any statements were made indicating a crime," to advise the defendant of his rights under Miranda v. Arizona, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966). As pointed out above, the defendant stated to relatives, in the presence of the attending officer, that he and his wife had had an argument while reclining on the sofabed, that he "smelled a terrible smell and saw she was shot." When Officer Roper was made aware of this, he asked the defendant's relatives to leave as "the detectives" would want to ask the defendant some questions.

At approximately 6:15 a.m. Detective Sisson, another officer in the crimes-against-persons unit, arrived at the hospital. He was briefed by Officer Roper and made aware of the defendant's statement. Detective Sisson then advised the defendant of the Miranda warnings and asked specifically if the defendant wanted an attorney; the defendant responded that he did not. Detective Sisson explained to the defendant that he was investigating the victim's death and then inquired, "Why were you bringing her to the hospital?" The defendant replied, "Because she was shot." When Detective Sisson asked how the victim had been injured, the defendant responded that he did not wish to answer further questions. Questioning ceased at that point.

During this time Sgt. Cook from the Special Activity Section of the police department was investigating the accident involving the defendant's car. He testified that it is the policy of his department to thoroughly investigate all traffic accidents involving fatalities prior to interviewing any of the survivors. When he was finally free to question the defendant, an hour and a half had passed from the time Detective Sisson had spoken to the defendant. At the time of Sgt. Cook's brief interview, the defendant was in a security room of the hospital. Detective Sisson and a hospital security agent were present. Cook testified that he was not aware of any earlier statements the defendant had made to Detective Sisson or other officers, nor was he aware that the victim had been shot. As a precautionary measure, however, he administered Miranda warnings before asking any

questions of the defendant.[3] At the time Miranda warnings were given, the defendant expressed a "willingness to talk" with Detective Cook. The defendant stated to Cook that he had found the victim unconscious, dragged her to his car and "made an emergency run" to the hospital where he lost control of his automobile. The defendant then refused to make a further statement and questioning ceased.

The defendant argues that the trial court erred in not suppressing the statements he made to Officer Cook. He argues that his right to remain silent was violated when Cook asked him about the accident after he had ninety minutes earlier informed Sisson he did not want to answer any more questions.

We find that the question defendant raises is controlled by Michigan v. Mosley, 423 U. S. 96 (96 SC 321, 46 LE2d 313) (1975) rather than Edwards v. Arizona, 451 U. S. 477 (101 SC 1880, 68 LE2d 378) (1981) as defendant suggests. In Mosley the Supreme Court rejected the position that one who has invoked his right to remain silent under Miranda "can never again be subjected to custodial interrogation by any police officer at any time or place on any subject." 423 U. S. at 102. In negating this argument the court held that "a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests." Id. Rather, the test for "admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.' " 423 U. S. at 104.

In Mosley the defendant was arrested for two armed robberies, advised of his rights and interrogated. When he declined to answer further inquiries, all questioning closed. Two hours later another detective, acting on information given by the arresting officer, advised the defendant of his rights under Miranda and questioned the defendant about an unrelated crime. The defendant made a statement implicating his involvement in the second crime which he unsuccessfully sought to suppress at trial. In affirming the trial court's action, the Supreme Court ruled that Mosley's right to cut off questioning had been fully respected, and that when the second

---

[3] Cook testified that while he was not aware the victim had been shot, he suspected she might have died prior to the automobile accident as her body had "a number of scrapes which did not bleed."

officer advised him of his Miranda rights, Mosley "was carefully given a full and fair opportunity to exercise these options." 423 U. S. at 105. The subsequent questioning did not undercut Mosley's previous decision not to answer (the first officer's) inquiries. 423 U. S. at 105. Important to the court's decision were the facts that the police did not refuse "to discontinue the interrogation upon request or . . . [persist] in repeated efforts to wear down [Mosley's] resistance and make him change his mind." 423 U. S. at 105-6. Instead, the officers "resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings." 423 U. S. at 106.

We note in this case that when the defendant indicated to Officer Sisson, and later to Officer Cook, that he wished to terminate the interviews, questioning immediately ceased. In no instance did the defendant indicate he wished to consult an attorney even when this option was specifically made available, apart from the Miranda warning. It is also clear that while the officers were investigating the same event, i.e., the victim's death, Officer Cook's inquiry was limited to whether her death was a vehicular homicide or whether the case should be transferred to the crimes-against-persons unit. At the time of questioning, Officer Cook was unaware the victim had been shot and that Officer Sisson had previously questioned the defendant regarding his wife's death. There is no evidence to support the allegation that the officers engaged in an attempt to "wear down the defendant's resistance." Furthermore, there was a time lapse of one and one-half hours between the interviews. Had Officer Cook been aware of the earlier interview, we cannot say that it would have been unreasonable for him to inquire whether the defendant had changed his mind during this period and wished to make a statement. We conclude, under these circumstances that the defendant's right to cut off questioning was "scrupulously honored."

We disagree with the defendant that Edwards v. Arizona, supra, controls this case. That case is limited to holding that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." 101 SC 1880 at 1884. No request for counsel was made in this case. We decline to adopt the rule suggested by defendant which would amount to a *per se* exclusion of any statement made, under any circumstances, by an accused after the right to remain silent has been invoked. See Oregon v. Bradshaw, —— U. S. —— (103 SC 2830, 77 LE2d 405) (1983).

*Judgment affirmed. All the Justices concur.*

DECIDED SEPTEMBER 9, 1983.

*Jimmy D. Berry, Thomas E. Spraley,* for appellant.

*Thomas J. Charron, District Attorney, Jack E. Mallard, Assistant District Attorney, Michael J. Bowers, Attorney General, Mary Beth Westmoreland, Assistant Attorney General,* for appellee.

HILL, Chief Justice, concurring.

Although I concur in the judgment under the facts of this case,[1] in my opinion the charge complained of in Division 1 should not be given because in many cases it could be error. See *Hosch v. State,* 246 Ga. 417 (271 SE2d 817) (1980).

In *Hosch,* we disapproved the use of a similar charge using the word "presumption" and suggested substitution of the word "infer." *Hosch v. State,* 246 Ga. at 420 n. 2. Also in *Hosch,* 246 Ga. at (4), the murder conviction was reversed because the charge was phrased in terms of the ultimate issue to be decided: "the law presumes *murder.*" Accord, *Johnson v. State,* 249 Ga. 621 (292 SE2d 696) (1982); *Jordon v. State,* 232 Ga. 749, 750 (208 SE2d 840) (1974). Here, the charge was "the presumption of an intention to kill would arise." Intention to kill is inextricably interwoven with murder with malice aforethought. OCGA § 16-5-1(a), (b) (Code Ann. § 26-1101). I therefore would urge use of the charge approved in *Hosch,* supra, in lieu of the charge used in this case.

---

[1] Under the evidence here, two possibilities were presented. Either the defendant intentionally shot the victim in the back, or the victim lay down on the gun which was on the bed (i.e., the gun not was in the defendant's hand). Under these circumstances, the charge given is not erroneous (as the court finds).