## S96A1639. WALTON v. THE STATE.
(482 SE2d 330)

BENHAM, Chief Justice.

Appellant Terry Walton and three others were indicted for the murder of Stanley Jones, who was shot just before 11:00 p.m. while seated in his automobile in the parking lot of the Columbus, Georgia nursing home which employed his wife.[1] One co-indictee testified for the State in exchange for a reduction in the charge against him from murder to voluntary manslaughter. Appellant Walton and the two remaining co-indictees, Marvin and Terrence Williams, were tried together. Walton and Terrence Williams were found guilty of murder, and Marvin Williams was acquitted. Appellant Walton contends the evidence was insufficient to convict him of malice murder, the trial court erred in admitting into evidence a custodial statement, and the trial court erroneously let stand racially-based peremptory challenges exercised by the State.

1. The State presented several witnesses who testified that co-defendant Terrence Williams was very angry with the victim the day Jones was killed because the victim had not paid Williams for the crack cocaine Williams had supplied him. Complaining that the victim had robbed him, Williams enlisted the aid of several friends, including his three co-indictees, to find Jones and punish him. Williams told appellant Walton and Ernest Bonner, the co-indictee who agreed to plead guilty to a reduced charge in exchange for his testimony, that he wanted Jones killed. Appellant told Bonner that Williams did not have enough money to have Jones killed and that he, Walton, did not wish to be paid in drugs. The group was unsuccessful in its initial efforts to find Jones and returned to Williams' residence where Bonner, Williams, and Walton cleaned 9 mm Black Talon bullets supplied by Williams. A pawnshop owner testified that he had sold a 9 mm Ruger semi-automatic pistol and 9 mm Black Talon shells to Williams. After learning that Jones would be at the nursing home that night to provide transportation for his wife, Williams drove Bonner and Walton to the nursing home parking lot. The trio parked to the left of the victim's car and appellant, the back seat pas-

---

[1] The crime occurred on March 14, 1993. A warrant for appellant's arrest was issued on March 30, and he was arrested in Michigan on August 18, 1993. He waived extradition and returned to Georgia in October 1993, where he and his co-indictees were charged with malice murder and possession of a firearm during the commission of a crime in an indictment returned November 23, 1993. The trial commenced July 18, 1994, and culminated on July 22 with the return of guilty verdicts against appellant and one co-indictee on the murder charge. Appellant was sentenced to life imprisonment five days later, and filed a timely motion for new trial, which was amended nearly two years later, on May 31, 1996. The motion was denied June 20, 1996, and a notice of appeal was filed the following day. The case was docketed in this Court on July 9, 1996, and submitted for decision without oral argument.

senger in Williams' car, fired three shots through the driver's side window of Jones' car, fatally wounding him. The trio fled the scene immediately. Three 9mm Black Talon bullets were recovered from the victim. Two or three days later, Williams gave Bonner $800 and Bonner and appellant went to Detroit, Michigan.

Williams turned himself in to police on March 30, the day arrest warrants for the trio were issued. In August 1993, Bonner was arrested in Chicago, Illinois, when police investigating a traffic accident in which he was involved discovered the outstanding murder warrant against him. Walton was arrested in Detroit shortly after Bonner's arrest. When informed of Bonner's statement chronicling the homicide, what led to it, and naming appellant as the triggerman, appellant pronounced the statement "basically . . . correct." The evidence presented was sufficient to authorize a rational trier of fact to find appellant guilty beyond a reasonable doubt of malice murder and possession of a firearm during the commission of a crime. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Two months after his arrest in Detroit, appellant was transported from Michigan to Georgia via car by two Columbus detectives, one of whom advised appellant of his rights as the threesome prepared to leave Detroit. After being on the road for approximately two hours, one of the detectives asked appellant if he wished to make a statement. According to the detectives' testimony at the *Jackson-Denno* hearing, appellant declined the opportunity, but inquired whether anyone else had given a statement. When told by the detective that Bonner had, appellant asked what Bonner had said. The detective summarized Bonner's statement, telling appellant that Bonner had said that Walton, Bonner, and Williams had discussed killing Jones and that Walton had shot the victim as he sat in his car in the nursing home parking lot. When the detective finished, appellant commented that Bonner's statement was "basically correct." The detective testified that appellant had not asserted his right to counsel after being informed by the detective of his rights prior to their departure from Michigan, but admitted he "had no idea" whether appellant had asked for an attorney from Michigan law enforcement authorities. Appellant also testified at the hearing and stated that, while in custody in Michigan, he had requested an attorney of a Michigan officer (Sgt. John Moore), an FBI agent (George Nacopolous), and of one of the Georgia detectives. It was also appellant's recollection that the Georgia detective had advised him of his rights in the presence of the Michigan officer and the other Georgia detective, and that appellant had invoked his right to counsel. He said he reiterated his position when, during the car ride, the detective asked him if he had anything to say, and that the detective had asked him if he

wanted to hear what Bonner had said. Appellant denied making any comment upon hearing the summary of Bonner's statement.

The trial court ruled that appellant's comment on the substance of Bonner's statement was admissible because appellant had been informed of his *Miranda* rights, had voluntarily waived them, and had freely and voluntarily given the statement. The trial court also made alternative rulings: appellant had waived any rights that he might have earlier exercised by initiating further conversation with the detectives, and appellant had "responded . . . or volunteered without being questioned. . . ." On appeal, appellant contends it was error to admit testimony concerning his car-trip statement because it was the result of a conversation initiated by the Columbus detectives after appellant had invoked his constitutional right to have counsel present during custodial interrogation.

Appellant's assertion requires us to examine the *Jackson-Denno* testimony and the trial court's ruling thereon through the lenses provided by the U. S. Supreme Court in *Edwards v. Arizona*, 451 U. S. 477 (101 SC 1880, 68 LE2d 378) (1981), and its progeny. In *Edwards*, 451 U. S. at 484-485, the court imposed a "relatively rigid requirement" (*Arizona v. Roberson*, 486 U. S. 675, 681 (108 SC 2093, 100 LE2d 704) (1988)) when it held that a suspect who has "expressed his desire to deal with police only through counsel is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversation with the police" and knowingly and intelligently waives the right previously invoked. See also *Wilson v. State*, 264 Ga. 287 (2) (444 SE2d 306) (1994). Furthermore, an accused who has invoked his right to have counsel present during custodial interrogation does not make a valid waiver of that right by responding to further police-initiated custodial interrogation even if that conversation is preceded by an officer again advising him of his rights. *Edwards*, supra. See also *Brady v. State*, 259 Ga. 573 (1) (385 SE2d 653) (1989). In order for *Edwards'* " 'clear and unequivocal' guidelines to the law enforcement profession" (*Arizona v. Roberson*, supra at 682) to come into play, however, a suspect must have invoked his right to have counsel present during custodial interrogation. *Allen v. State*, 259 Ga. 63 (1) (a) (377 SE2d 150) (1989). See also *Bright v. State*, 251 Ga. 440 (306 SE2d 293) (1983) (where this Court declined to apply *Edwards* when the defendant had invoked only his right to remain silent).

In the case at bar, the trial court determined that appellant had waived his "*Miranda*" rights, including the right to have counsel present during custodial interrogation. The trial court sits as the factfinder in a *Jackson-Denno* hearing, and its resolution of factual issues will be upheld by the appellate court unless it is clearly erro-

neous. *White v. State*, 255 Ga. 210 (2) (336 SE2d 777) (1985). The testimony of the Georgia detectives supports the trial court's conclusion that appellant did not invoke his right to counsel when the Georgia authorities arrived in Michigan to escort appellant back to Georgia. However, there is no evidence contradicting appellant's testimony that he had asserted his right to counsel to a Michigan deputy sheriff and an FBI agent while he was incarcerated in Michigan on the Georgia murder warrant. Since the Supreme Court imposed in *Edwards* a duty on law enforcement authorities "to maintain a procedure to determine whether a suspect has previously invoked the right to counsel" (*Roper v. State*, 258 Ga. 847 (1) (a) (375 SE2d 600) (1989)), the Georgia detectives' lack of knowledge of appellant's assertion is not dispositive because knowledge of the invocation of the right to counsel to a law enforcement officer is imputed to all others. *Cansler v. State*, 261 Ga. 693 (3) (409 SE2d 504) (1991). In light of the lack of any evidence rebutting appellant's testimony that he had told law enforcement authorities in Michigan that he wished to deal with the police only through counsel, we will assume that he did invoke his right to counsel, and examine whether the trial court's alternative holdings, i.e., that appellant waived his right by initiating conversation with the detectives and that appellant's statement was not the product of interrogation, are supported by any evidence.

3. In *Edwards*, the U. S. Supreme Court laid down a "bright-line prophylactic . . . rule" (*Arizona v. Roberson*, supra, 486 U. S. at 682): custodial interrogation of an accused must cease upon the accused's invocation of the right to counsel, and an accused does not waive his previously-invoked right to counsel by submitting to police-initiated custodial interrogation, but may waive the right if he "initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, supra, 451 U. S. at 484-485. See also *Brady v. State*, supra, 259 Ga. 573 (1). A divided U. S. Supreme Court addressed the issue of "initiating conversation" in *Oregon v. Bradshaw*, 462 U. S. 1039 (103 SC 2830, 77 LE2d 405) (1983). A four justice plurality held that an accused initiates conversation when he "evince[s] a willingness and a desire for a generalized discussion about the investigation. . . ." Id., 462 U. S. at 1045. Four other justices believed that an accused initiates conversation when he "reopens the dialogue about the subject matter of the criminal investigation." Id., 462 U. S. at 1054. Eight of the nine justices agreed that the "initiation" question was the first of a two-step process for determining whether an accused had waived the right to counsel — even if the accused initiated the conversation, there must then be an inquiry whether a valid waiver of the rights to counsel and to remain silent occurred. Id., 462 U. S. at 1044-1045, 1055, n. 2. See also *Edwards v. Arizona*, supra, 451 U. S. at 486, n. 9; *Brockman v. State*, 263 Ga. 637

(1) (b) (436 SE2d 316) (1993).[2]

In the case at bar, all three occupants of the car agreed that one of the detectives first displayed a willingness and desire to talk about the investigation by inquiring whether appellant wished to make a statement about the charges lodged against him. Compare *Guimond v. State*, 259 Ga. 752 (386 SE2d 158) (1989) and *Snipes v. State*, 188 Ga. App. 366 (2) (373 SE2d 48) (1988) (where the issue of who initiated the conversation was one of fact or credibility). In light of the uncontradicted testimony, we must conclude that the trial court was clearly erroneous when it ruled that appellant initiated the conversation.

4. That determination, however, does not end the inquiry because the trial court also found that the statement used against appellant was not the product of "interrogation." In *Rhode Island v. Innis*, 446 U. S. 291, 300-301 (100 SC 1682, 64 LE2d 297) (1980), the U. S. Supreme Court defined the "interrogation" which must be preceded by *Miranda* warnings as the "express questioning [of a person in custody] or its functional equivalent . . . [t]hat is, . . . any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. . . ." The court went on to note, however, that "[t]he police surely cannot be held accountable for the unforeseeable results of their words or actions. . . ." Id. at 301. The *Innis* definition of "interrogation" is applicable to cases presenting an *Edwards* question since the *Miranda* warnings "are implemented by the application of the *Edwards* corollary" discussed above. *Arizona v. Roberson*, supra, 486 U. S. at 681.

If, in the case at bar, appellant had made an incriminating statement in response to the detective's query whether he wished to make a statement, the prophylactic rule of *Edwards* would have precluded the State's use of the statement. See *Vaughn v. State*, 248 Ga. 127 (1) (b) (281 SE2d 594) (1981).[3] However, appellant's observation that

---

[2] The record in the case at bar does not reflect that the second inquiry was made after it was determined that appellant initiated the conversation in the car. Compare, e.g., *Guimond v. State*, 259 Ga. 752 (2) (386 SE2d 158) (1989); *Connerly v. State*, 207 Ga. App. 498, 499 (428 SE2d 408) (1993) (when the accused initiated the conversation, he executed a waiver of rights before making the statement subsequently used against him).

[3] In *White v. State*, 168 Ga. App. 794, 796 (310 SE2d 540) (1983), a majority of the Court of Appeals held that *Edwards* had not been violated when an accused, who had requested to speak with an attorney after being arrested, gave an incriminating response to a detective who asked him whether he wished to make a statement. The Court of Appeals opined that *Edwards* applied only to cases where an accused had been subjected to questioning (other than that normally attendant to arrest and custody) prior to invoking the right to counsel. In so holding, the Court of Appeals limited the *Edwards'* rule to situations wherein an accused is subjected to "reinterrogation." Id. See also *White v. State*, supra, 168 Ga. App. at

Bonner's statement, as summarized, was "basically correct," was not given in response to a question posed by one of the detectives, but was appellant's unsolicited comment on the *detective's* answer to *appellant's* line of questioning. We have previously held that an accused's response to an officer's answer to a question posed by the accused is not the product of custodial interrogation. *Delay v. State*, 258 Ga. 229 (3) (c) (367 SE2d 806) (1988). While a law enforcement officer's summary of evidence implicating an accused was deemed to be "custodial interrogation" when the law enforcement officer admitted that he had summarized the evidence for another officer, within earshot of the accused, in an effort to get the accused to make an incriminating statement in response to overhearing the summary (*Cottingham v. State*, 206 Ga. App. 197 (4) (424 SE2d 794) (1992)), no such admission of intent was made by the detective involved in the case at bar. Although the car-trip conversation between appellant and the detective began with an improper question put to appellant by the detective, the statement used against appellant was not in response to an express question posed by the detective or words or actions the detective should have known were likely to elicit an incriminating response. See *Turner v. State*, 199 Ga. App. 836 (3) (406 SE2d 512) (1991). Compare *Metheny v. State*, 197 Ga. App. 882 (1) (b) (400 SE2d 25) (1990). We cannot find clearly erroneous the trial court's implicit determination that appellant's statement was an unforeseeable result of the officer's action in responding to appellant's questioning. Consequently, we conclude, as did the trial court, that the statement used against appellant was not the product of custodial interrogation and was properly admitted.

5. We next turn to appellant's assertion that the trial court erred when it ruled that the State's reasons for exercising peremptory strikes which removed three black persons from the venire were race-neutral, case-related, clear and reasonably specific. *Greene v. State*, 266 Ga. 439 (5) (469 SE2d 129) (1996).

We need look no farther in this matter than one venireperson. Speaking of that potential juror, the Assistant District Attorney (ADA) noted that she had "made the statement that she felt like there was a dual system of justice . . . against black people who are tried by the courts in this country. . . ." The ADA also recalled that the venireperson was acquainted with, or had a cousin who was acquainted with, C. B. King, a recently-deceased attorney in the area. The ADA summarized Mr. King's litigation practice as one in which

798 (Carley, J., dissenting). Because it is clear that *Edwards* prohibits police-initiated interrogation after the invocation of the right to counsel without regard to whether the accused was questioned before invoking the right to counsel we overrule *White* to the extent that it holds otherwise.

"race was usually brought up prominently, was argued to the jury, was . . . his main defense [—] an appeal to black jurors' own race. . . ." The ADA stated that "[he] thought because her cousin knew C. B. King at one time and her statement that she thought there was a dual system of justice or there could be a dual system of justice . . . that she might, if on this jury, try to even up for past wrongs and straighten the system out by letting these defendants go. . . ." When the trial court questioned whether that rationale was racially neutral, the ADA explained he was not striking the woman on account of her race, but "because of C. B. King and his appeals." When the trial court observed that the venireperson's cousin was a former president of the Georgia Association of Criminal Defense Lawyers, the ADA responded that he had borne that fact in mind "as well as C. B. King [and] the dual system of justice. . . ."

The reason given by the ADA, the venireperson's connection with a lawyer who knew C. B. King, and that venireperson's belief that there was a dual system of justice, cannot fairly be said to be "case-related, clear and reasonably specific," id., because it is not supported by the record. All the venireperson said was that she had a cousin in Georgia who was a lawyer. The rest of the lawyer's connections were supplied by counsel for the State and the defense. As to the belief in a dual system of justice, the record shows that counsel for one of appellant's co-defendants pointed out to the venireperson that another juror had expressed such a belief, but the venireperson specifically disclaimed that position for herself.

The other reason asserted on appeal in support of the peremptory strike of that venireperson is that the venireperson's cousin was a president of the Georgia Association of Criminal Defense Lawyers. However, it is clear from the transcript that that rationale for the exercise of the strike did not emanate from the ADA, but from the trial judge. It was the duty of the ADA, as proponent of the strike, to articulate the reasons for the exercise of a challenged peremptory strike. *Turner v. State*, 267 Ga. 149 (2) (476 SE2d 252) (1996). While the prosecuting attorney acts responsibly when he solicits or accepts input from others concerning the exercise of peremptory challenges (*Lewis v. State*, 262 Ga. 679, 681 (424 SE2d 626) (1993)), the trial judge, who is the arbiter of whether an attorney has proffered a race-neutral rationale for peremptory strikes, cannot be perceived as providing the very rationale which the judge must then adjudicate as racially neutral or racially based. To permit the trial judge to participate in providing a race-neutral reason for strikes removes the judge from a position of impartiality and strikes at the core of the constitutional guarantees of a fair trial. We will not consider, therefore, in support of a claim that a particular peremptory challenge was exercised for race-neutral reasons, reasons supplied by the trial judge

instead of the attorney for the side exercising the strike.

It follows that neither of the reasons given for striking that particular venireperson meet the requirement in *Greene*, supra, that they be "race-neutral, case-related, clear and reasonably specific." The trial court erred, therefore, in overruling Walton's *Batson* challenge, as a result of which, Walton is entitled to a new trial.

*Judgment reversed. All the Justices concur, except Sears and Carley, JJ., who concur specially and Hunstein and Hines, JJ., who dissent.*

CARLEY, Justice, concurring specially.

I join the majority opinion as to Divisions 1-4. I agree with the majority that there was at least one racially motivated reason given in support of the peremptory strike of the venireperson discussed in the majority opinion and that, therefore, *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986) requires reversal and the grant of a new trial. However, I cannot join in all that is said in Division 5 of the majority opinion. Instead, I believe that reversal is required under the holding of *Strozier v. Clark*, 206 Ga. App. 85 (5) (424 SE2d 368) (1992). Unlike the dissenters, I do not believe that *Lingo v. State*, 263 Ga. 664 (437 SE2d 463) (1993) implicitly disapproved *Strozier*. To the contrary, *Lingo* expressly approved *Strozier* as establishing "the rule that where racially-neutral and neutrally-applied reasons are given for a strike, the simultaneous existence of any racially motivated explanation results in a *Batson* violation." *Lingo v. State*, supra at 668. Thus, I do not think we can overrule *Strozier* without also overruling *Lingo*. Under *Lingo* and *Strozier*, there was *Batson* error in this case requiring reversal.

I am authorized to state that Justice Sears joins in this special concurrence.

HUNSTEIN, Justice, dissenting.

I concur in the majority opinion except for Division 5 concerning disqualification of a prospective juror.

The majority concludes that the trial court erred when it ruled that the State's reasons for exercising a peremptory strike which removed Juror # 17, a black woman, from the venire were race-neutral, case-related, clear and reasonably specific. See *Greene v. State*, 266 Ga. 439 (5) (469 SE2d 129) (1996). I would conclude that the trial court's determination that appellant failed to establish purposeful discrimination was not clearly erroneous. *Lingo v. State*, 263 Ga. 664, 666 (437 SE2d 463) (1993).

The prosecutor gave multiple reasons for his exercise of challenges against Juror # 17: because her attorney-cousin had shared a legal practice with C. B. King (an attorney the prosecution character-

ized as notorious for injecting race as an issue in his cases); because when questioned by counsel for one of the defendants, Juror # 17 had expressed some reservations about a dual system of justice; and because Juror # 17's lawyer-cousin had served as President of the Georgia Criminal Defense Lawyers Association.

Although we must insure that peremptory strikes are not exercised for racially-motivated reasons, the presence of one potentially racially-motivated explanation does not tarnish jury selection under *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986) in those situations where counsel gives multiple reasons justifying the exercise of a peremptory challenge against a particular venireperson *and* those reasons include a racially-neutral explanation for striking the juror which is not itself a pretext for removing the juror for the racially-discriminatory reason. *Lingo v. State*, supra at 668-669. In *Lingo v. State*, we examined the Court of Appeals' holding in *Strozier v. Clark*, 206 Ga. App. 85 (5) (424 SE2d 368) (1992) (holding that the jury selection process is invalidated under *Batson* when a racially-motivated explanation for striking a venireperson accompanies a racially-neutral explanation for removal of that venireperson) and concluded that where simultaneous reasons are given for removing a juror, the jury selection process is invalidated only "where it can be determined that the racially-neutral explanation is, in fact, pretextual since there is a racially motivated reason that can be independently determined . . . ." *Lingo v. State*, supra at 668, fn. 4. Accordingly, while the existence of competing explanations for the exercise of a peremptory challenge calls for greater scrutiny by the trial court to insure that *Batson's* mandate to eliminate racial discrimination is upheld, mere injection of a racially-motivated explanation into the jury selection process does not so infect the procedure as to render unavoidable the reversal of the case.[4]

Applying the above analysis to the record in this case, I would find no reversible error in the dismissal of Juror # 17. One reason given by the prosecutor for striking Juror # 17 was her relationship with King. Standing alone, the juror's connection to King would have been an inappropriate basis upon which to base jury selection. The goal of *Batson* and its progeny, to eliminate racial discrimination in jury selection, is clearly not furthered by striking a prospective juror solely because of a tenuous association with any individual known for espousing controversial positions on racial issues. However, the prosecutor gave two other reasons for striking Juror # 17: that she believed there may exist a dual system of justice, and that her cousin

---

[4] Because it is inconsistent with *Lingo v. State*, I would thus reject the position set forth in *Strozier v. Clark* that *any* racially-motivated explanation automatically vitiates the jury selection process.

had been president of a criminal defense bar organization. Applying *Lingo v. State* to these facts, the question is whether the racially-neutral explanations given by the prosecutor for striking the juror were a pretext for the independent racially-motivated rationale of a relationship with King. As to the dual system of justice reason, my review of the transcript reveals that the juror was responding to questioning by one of the defense attorneys (and not the prosecutor) who asked her whether she shared the same "concern" with another prospective juror "about a dual system of justice for minorities." The juror responded that she had "seen or read about trials where I felt that was the case. That's not how I feel all of the time. I just take it case by case." The transcript also reveals that when the prosecutor was later called upon to explain his strikes,[5] he stated he believed the juror had said she "thought there was a dual system of justice or there could have been a dual system." Neither the defense nor the trial court indicated that the prosecutor's impression of what Juror # 17 had said was mischaracterized. Had the facts been as the prosecutor believed them to be, the statement by Juror # 17 would have constituted a race-neutral reason for striking her, as

> "the ultimate inquiry for the [trial court] is not whether counsel's reason[s are] suspect, or weak, or irrational, but whether counsel is telling the *truth* in his or her assertion that the challenge is not race-based." [Cit.]

(Emphasis supplied.) *Smith v. State*, 264 Ga. 449, 454 (448 SE2d 179) (1994). There is no showing in the record that the prosecutor deliberately misinterpreted Juror # 17's response in order to make a racially-neutral reason pretextual. The fact that the prosecutor may have been less attentive while defense counsel were going forward with their voir dire is irrelevant to whether the prosecutor acted with racial animus. It is the subjective intent of the prosecutor which is at issue in reviewing a *Batson* challenge, not the accuracy of the prosecutor's notes on voir dire.

The other reason articulated for the strike, that Juror # 17 was related to someone who had been president of a Georgia criminal defense association, was undoubtedly race-neutral. I acknowledge that the cousin's relationship to the defense association was first raised by the trial judge; however, the prosecutor affirmatively stated that he recollected the relationship and actively endorsed to the trial court that the cousin's affiliation to the defense group was a factor in his decision to exercise a strike against Juror # 17. Under

---

[5] The transcript reveals that 16 more prospective jurors were questioned after Juror # 17.

these circumstances, we cannot presume that the prosecutor's endorsement of the race-neutral reason was purely pretextual merely because it was first mentioned by the trial court.

In reviewing the trial court's disposition of a *Batson* motion, we must always bear in mind that the trial court's decision whether a prosecutor's strikes were the result of neutral selection procedures rests largely upon an assessment of the prosecutor's state of mind, demeanor and credibility and as such lies peculiarly within the province of a trial judge whose findings we must accord great deference and disregard only if clearly erroneous. *Lingo v. State*, supra at 669; *Smith v. State*, supra at 454. Accordingly, we are not authorized to presume racial animus from an ambiguous record where the trial judge who oversaw the proceedings concluded otherwise. Contrary to the conclusion of the majority, there exist racially-neutral explanations which served as the basis for the exercise of the State's challenges. Because it was clearly permissible under these facts for the prosecutor to strike Juror # 17 on the basis of her relationship with her lawyer-cousin and on the basis of his impression of her belief in a dual system of justice, I would conclude that the trial court did not err in finding that the reasons offered by the State for excluding this prospective juror were sufficiently race-neutral to withstand a *Batson* challenge. Finding no other reason for reversal of this case, I would affirm.

I am authorized to state that Justice Hines joins in this dissent.

DECIDED MARCH 17, 1997 —
RECONSIDERATION DENIED APRIL 3, 1997.

*William J. Mason*, for appellant.
*Douglas C. Pullen, District Attorney, Lori L. Canfield, Margaret E. Bagley, Assistant District Attorneys, Michael J. Bowers, Attorney General, Paula K. Smith, Senior Assistant Attorney General*, for appellee.