A08A0309. GRANT-FARLEY v. THE STATE.
(664 SE2d 302)

MIKELL, Judge.

Aaron Grant-Farley was convicted of four counts of armed robbery and four counts of aggravated assault. For sentencing purposes, the aggravated assault counts were merged into the armed robbery counts, and Grant-Farley was sentenced to ten years on each count to serve consecutively. On appeal, Grant-Farley challenges the admission of his custodial statements into evidence. We affirm.

"On appeal from a criminal conviction, the evidence must be viewed in the light most favorable to support the verdict, and [the defendant] no longer enjoys a presumption of innocence."[1] Further,

> [w]e do not weigh the evidence or determine witness credibility but only determine whether the evidence is sufficient under *Jackson v. Virginia*.[2] The verdict must be upheld if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[3]

So viewed, the evidence shows that at approximately 6:00 p.m. on Sunday, January 27, 2002, a PetSmart store located in Cobb County was robbed. Georgette Franji, a manager at the store, testified that she noticed a white four-door car circling the parking lot when she and other employees were outside gathering carts; that the employees were completing their closing duties when she went to the receiving area to make sure that everything was locked up; that former employee, Anthony Justice, came up behind her with a gun, put it against her head, and threw her on the floor; that she knew the masked gunman was Justice by his eyes, his general demeanor, and his voice; and that after cursing at her, he forced her to the front of the store, where four other employees were lying face down on the floor at gunpoint. Franji recalled that Justice and two other masked gunmen took her into the cash office while another man stayed with the employees. They made her open the safe, and she gave them all of the money contained therein, with the exception of rolled pennies, and the credit cards that were stored in the safe.

Franji further testified that after she was moved from the cash office, the gunmen started tapping the employees on their heads with their guns saying that they were going to kill one of them. The gunmen then talked about how they were pressed for time and exited the store through the back emergency exit. Franji and the employees locked themselves in the cash office, and called 911. They remained in the cash office, which had no windows and was secure, until police officers arrived. On cross-examination, Franji testified that the four gunmen were black.

Sergeant Joel Horne of the Cobb County Police Department testified that he responded to the 911 call involving the armed robbery at PetSmart; that the dispatcher issued a lookout call for a white four-door vehicle occupied by four black males, one of whom

---

[1] (Citations, punctuation and footnotes omitted.) *Jackson v. State*, 252 Ga. App. 268 (1) (555 SE2d 908) (2001).

[2] 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

[3] (Citation omitted.) *Dixon v. State*, 252 Ga. App. 385 (556 SE2d 480) (2001).

was wearing a red, white, and blue shirt, blue jeans, and black boots, and the others, black clothing; and that he drove to the area to look for the car and advised other officers to do the same. As Horne sat at a red light, a white Acura Integra occupied by four black males pulled up to the light, and Horne could see that the front seat passenger was wearing a black shirt. Horne continued to look at the vehicle and noticed that the men appeared to be very nervous, surprised, and scared. Horne testified that he followed the vehicle and that the back seat occupants kept turning back to look at him. Horne decided to initiate a traffic stop because the vehicle was about to enter Fulton County.

After stopping the car, Sergeant Horne yelled to the driver to exit the car and walk toward him and told the remaining passengers to raise their hands so he could see them. Horne patted down Justice, who was the driver, and placed him in the back seat of his patrol car. Within ninety seconds, backup officers arrived, and one of them placed Grant-Farley, who was a passenger in the white car, in the back of his patrol car. Horne then received a call from Officer Hecksher, who was at the PetSmart store, advising him that one of the store employees believed that Justice was one of the perpetrators. As Horne approached the vehicle to retrieve Justice's wallet, which Justice had given him consent to do, he saw several items through the hatchback window of the car, including a black ski mask, a red, white and blue short-sleeved shirt, other black clothing, a latex glove, and a plastic bag tied into a knot. Horne testified that he notified the detectives' unit of the items that he had found and when they arrived, he turned the scene over to them. All four of the occupants in the car were arrested.

During the *Jackson-Denno* hearing, Detective Ronson Smith testified that he interviewed Grant-Farley at the Cobb County Police headquarters. Smith testified that Grant-Farley was in custody and was not free to leave; that he interviewed him at about 2:40 a.m.; that he determined that Grant-Farley could read and write before reading his rights to him; that he read Grant-Farley his *Miranda* rights before he talked to him; that he read the waiver of rights form[4]

---

[4] The form provided as follows:
Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish. If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.
Below the recitation of rights, the form also included the following paragraph:

to Grant-Farley and that Grant-Farley repeatedly read through the form before he signed it; and that he did not threaten or coerce Grant-Farley and did not make any promises or offer a hope of benefit to him.

Smith testified that he placed a key chain that had been recovered from the back of PetSmart on the table and asked Grant-Farley if the keys belonged to him. Grant-Farley replied that they did. Smith testified that Grant-Farley then told him that he acted as a lookout but when Smith asked a follow-up question, Grant-Farley said he thought that he needed to talk to a lawyer. Smith moved toward the door and told Grant-Farley that he could no longer question him. Grant-Farley tried to get Smith to stay in the room, telling him that he wanted to be cooperative, but Smith explained that he could no longer talk to Grant-Farley.

Approximately an hour later, Sergeant Brian Gordon walked to the interview room, where Grant-Farley was being held to check on the officer who was responsible for watching Grant-Farley. Grant-Farley asked Gordon for Detective Smith and said that he wanted to tell the detective what happened. Gordon told Grant-Farley that Detective Smith was busy but that he would listen if Grant-Farley wanted to talk to him. Grant-Farley said that he wanted to talk, and Gordon left the room to get a tape recorder. Gordon testified that he started the tape, asked Grant-Farley if he had been pressured to give a statement and whether his statement was freely given, and then re-advised Grant-Farley of his rights. Grant-Farley re-signed the waiver of rights form. Grant-Farley then implicated himself in the armed robbery. Grant-Farley told Gordon that he met with Justice earlier that day and that Justice told him that he wanted to rob the store; that Grant-Farley parked his vehicle down the street from the store; that each of the perpetrators had BB guns; that he went into the office with the manager, who opened the safe; that they robbed the employees and ran out the back door; that they put the guns, money, and clothing into Grant-Farley's vehicle but could not leave in it because he had dropped his keys so they left the scene in Justice's car.

The trial court admitted Grant-Farley's statements to Smith and Gordon, concluding that Grant-Farley's statements were taken pursuant to *Miranda*; that Grant-Farley waived his rights before making the statements regarding his keys and his activities; that

---

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.
This paragraph was followed by signature lines for the person giving the statement and witnesses.

Grant-Farley then invoked the right to counsel, which the officers honored; and that Grant-Farley re-initiated conversation with Officer Gordon.

On appeal, Grant-Farley raises the single enumeration of error that his statements should not have been admitted. "The trial court sits as the factfinder in a *Jackson-Denno* hearing,"[5] and its "findings as to factual determinations and credibility relating to the admissibility of the defendant's statement at a *Jackson-Denno* hearing [must] be upheld on appeal unless clearly erroneous."[6] Based upon our review of the transcript of the *Jackson-Denno* hearing, "we find that the trial court did not err in finding the statements admissible."[7]

> In *Edwards[ v. Arizona]*,[8] the [United States Supreme C]ourt imposed a relatively rigid requirement when it held that a suspect who has "expressed his desire to deal with police only through counsel is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversation with the police" and knowingly and intelligently waives the right previously invoked.[9]

a. *Grant-Farley's statements to Smith.*

Grant-Farley argues that once he invoked his right to counsel, Smith should not have remained in the room and listened to his comments. Explaining his conduct, Smith testified that after Grant-Farley said that he thought he needed to talk to an attorney,

> I certainly believed it was an invocation of his rights and I believe I had a notepad or something but I made a movement towards the door and told him that I could no longer question him and he immediately began to try and get me to sit down and talk with him and saying things like, I told you I wanted to be cooperative, and that kind of thing and I was trying to explain why I couldn't do that at that point, or I certainly didn't feel comfortable doing that at that point . and this continued for several minutes. The actual only part of the interview that I was able to get was very brief and

---

[5] *Walton v. State*, 267 Ga. 713, 715 (2) (482 SE2d 330) (1997).

[6] (Citation omitted.) *Edge v. State*, 275 Ga. 311, 312 (2) (567 SE2d 1) (2002).

[7] (Footnote omitted.) *Overstreet v. State*, 250 Ga. App. 336, 340 (4) (551 SE2d 748) (2001).

[8] 451 U. S. 477 (101 SC 1880, 68 LE2d 378) (1981).

[9] (Citations omitted.) *Walton*, supra, citing *Edwards*, supra at 484-485.

then the remaining portion of that interview was spent trying to explain to him why I was getting up and walking out of the room and he was basically [sic] in the end he was begging me to sit down and talk to him and trying to shake my hand.

Grant-Farley did not testify at the *Jackson-Denno* hearing or offer other evidence to dispute Smith's testimony.

Grant-Farley does not refer us to any erroneously admitted incriminating statement that he made to Smith after he invoked his right to counsel. Instead, citing *Anderson v. State*,[10] Grant-Farley simply maintains that Smith's actions were improper. In *Anderson*, we explained that the word "interrogation" includes

> any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.[11]

There, we held that an officer's interrogation was improper where the officer encouraged the defendant to give his perspective and suggested that the defendant might "want to go ahead and tell [him]" about details.[12] In this case, however, there is no testimony that Smith said or did anything to elicit incriminating statements from Grant-Farley, and in fact, there is no evidence that Grant-Farley made any additional statements to Smith. Therefore, Grant-Farley's statements that were made before he invoked his right to counsel were properly admitted,[13] and the colloquy between Grant-Farley and Smith that followed Grant-Farley's request for counsel did not render the earlier statements inadmissible.

b. *Grant-Farley's statements to Gordon.*

It is undisputed that Grant-Farley's statements to Gordon were

---

[10] 228 Ga. App. 617 (492 SE2d 252) (1997).

[11] (Citation and punctuation omitted.) Id. at 618-619 (1) (b).

[12] (Punctuation omitted.) Id. at 619 (1) (b).

[13] See *Gosdin v. State*, 272 Ga. 205, 207 (2) (b) (528 SE2d 230) (2000) (no error where trial court's finding that statement was admissible was based on testimony that defendant was advised of his *Miranda* rights and waived them, and that the statement was given freely and voluntarily).

made after he invoked his right to counsel. Therefore, in determining their admissibility, we are governed by a different standard.

> Where, in the course of a custodial interrogation, a defendant invokes his right to counsel, subsequent statements in response to further questioning are admissible only if (1) the defendant initiated the subsequent discussions and (2) the waiver of his previously invoked right was knowing and intelligent.[14]

Grant-Farley states in his brief that Gordon asked improper "if you don't tell me I'll never get your side of the story" type questions and played upon Grant-Farley's fears, but he offers no evidence in support of his claims. No transcript of the tape recording was included in the record. The undisputed evidence, however, shows that Grant-Farley initiated the conversation with Gordon, that Gordon read Grant-Farley his rights a second time, and that Grant-Farley re-signed the written waiver of rights form before giving his incriminating statement. Gordon testified that he did not make any promises to Grant-Farley or threaten or coerce him to give a statement. Therefore, we cannot find clearly erroneous the trial court's findings that Grant-Farley's statements to Gordon were taken pursuant to *Miranda* and that he initiated the conversation with Gordon.[15] Accordingly, we affirm the judgment of the trial court.

*Judgment affirmed. Smith, P. J., and Adams, J., concur.*

DECIDED JUNE 26, 2008.

*Sidney L. Storesund*, for appellant.

*Patrick H. Head, District Attorney, Jason R. Samuels, Amelia G. Pray, Assistant District Attorneys*, for appellee.

---

[14] (Citations omitted.) *Height v. State*, 281 Ga. 727, 728 (2) (642 SE2d 812) (2007). See also *Harvell v. State*, 275 Ga. 129, 130 (2) (562 SE2d 180) (2002) (statement admissible where defendant initiated contact with police and gave his statement after signing a waiver form).

[15] See *Oliver v. State*, 276 Ga. 665, 667 (2) (581 SE2d 538) (2003) (statements volunteered by the defendant and not in response to questioning seeking to elicit incriminating responses are admissible); *York v. State*, 242 Ga. App. 281, 292 (6) (528 SE2d 823) (2000) (statement admissible where after invoking right to counsel, defendant initiated contact with police then freely and voluntarily waived his rights before giving the statement).